**Robert Lewis WALLACE, Petitioner,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent.**

**Civ. A. No. 83–72–ATH.**

United States District Court, M.D. Georgia, Athens Division.

March 8, 1984.

Elyse Aussenberg, American Civil Liberties Union of Ga., Hyatt Legal Services, Atlanta, Ga., Risa L. Lieberwitz, Whitney Point, N.Y., for petitioner.

Mary Beth Westmoreland, Atlanta, Ga., for respondent.

OWENS, Chief Judge:

Among the duties and responsibilities given United States district courts by Congress is that of considering and deciding applications of state prisoners for a writ of habeas corpus on the ground that the state prisoner "is in custody in violation of the Constitution or laws ... of the United States." 28 U.S.C. § 2254(a). This congressionally imposed duty and responsibility results in United States district courts—the trial courts of the federal court system—reviewing state criminal convictions that have already been reviewed by a Georgia trial court, a Georgia habeas court, and the state Supreme Court and found by them to be without United States Constitutional error. United States district court decisions are made by one district judge; the state trial, habeas, and appellate court decisions are made by one trial, one habeas, and seven Supreme Court judges. As a practical matter Congress has thus created a federal habeas system which requires one United States district judge to review and agree or disagree with the opinions of nine Georgia trial and appellate judges on constitutional questions. Most United States district court judges dislike their role in state prisoner habeas actions as much as state trial and appellate judges dislike the concept of one federal judge reviewing the opinions of at least nine state judges. *See, Schneckloth v. Bustamonte,* 412 U.S. 218, 263–64, 93 S.Ct. 2041, 2066–67, 36 L.Ed.2d 854, 884 (1973) (Powell, J., concurring). Nevertheless, until Congress changes this concept it remains for this one United States district court judge to consider this state habeas case, even though it has already been considered by one trial judge, one habeas judge, and seven Supreme Court justices (on two separate appearances) of this state and found by them to contain no United States constitutional error.

## FACTUAL BACKGROUND

As stated by the Supreme Court of Georgia in its opinion on petitioner's appeal to that court:

This is a death case. The [petitioner] appellant, Robert Lewis Wallace, was indicted for the murder of a Union Point police officer, an aggravated assault committed upon another Union Point police officer, the theft of a Union Point police vehicle, and driving under the influence. Although the offenses occurred in Green County, a change of venue was granted and the appellant was tried in Baldwin County Superior Court. He was found guilty of all charges. The jury found the existence of three aggravating circumstances and returned a death sentence. The trial court sentenced the appellant to death for the murder, twenty years imprisonment for the aggravated assault, seven years for the motor vehicle theft, and one year for driving while intoxicated—all sentences to be served consecutively.

\* \* \* \* \* \*

From the evidence presented at trial the jury was authorized to find the following facts:

The appellant was at the home of his girlfriend, Teresa Herring, on May 15, 1979. He was drinking and around midnight decided to drive to Atlanta to find a job. His girlfriend gave a statement to the GBI in which she said that she did not want him to leave and told him he would be stopped by the police for driving while intoxicated. He replied to the effect that if he were to be stopped by the police he would 'shoot hell out of them.' At trial she partially recanted her statement. The appellant had a shotgun, a pistol and three rifles in the car when he left Teresa Herring's home.

Just after midnight on May 16, 1979, Officers Rowry and Cook were patrolling the City of Union Point. The officers observed the appellant's car weaving across the centerline and going on and off the shoulder of the road. The officers stopped the appellant and, smelling

alcohol on his breath, gave him a field test which was positive. They asked appellant for his driver's license. Appellant told the officers it was not on his person and started to rummage through a box in the back of the car. The officers ordered him to stop and transported him to jail for a formal breath test.

After being transported, appellant was given a breath test which revealed a .11% blood alcohol content. He was told by the police that they would have to lock him up for driving under the influence and that he could be released on bond after four hours. Officer Rowry then left the room and went to prepare a cell. The appellant, alone with Officer Cook, begged not to be locked up. Officer Cook then took the appellant by the arm and told him to come on. At that point, appellant grabbed the officer's .357 magnum pistol and they grappled. Officer Rowry, hearing the scuffle, came back to help just as Officer Cook was shot in the lower abdomen. Officer Cook fell and momentarily lost consciousness. Appellant then shot Officer Rowry in the neck. Officer Rowry turned and ran, at which time appellant again fired but missed. He then turned and pointed the gun in Officer Cook's face from a distance of less than 2 feet and fired. However, Officer Cook moved his head and was not shot but received cuts from debris and powder burns. The appellant fled the scene in a patrol car.

Officer Cook was able to summon help. He was transported to a hospital and survived. Officer Rowry's body was found down the street from the jail.

Appellant hid the patrol car in the woods in Wilkes County and then made his way to his brother's home. He told his brother of the shooting and asked him to look into it. The brother found out that one of the officers died and that it was dangerous for appellant to stay around. Appellant decided to go to Atlanta. His brother gave him a .22 magnum pistol, which appellant took to Atlanta, along with a shotgun he had taken from the patrol car.

In Atlanta, appellant could not find a place to stay. Finally, he found a vacant basement apartment which he thought was in a deserted building. However, a woman lived upstairs. When she heard noises she called the Atlanta police, who investigated. They found the appellant behind a barricaded door. When he was arrested, he was reaching for the shotgun. When asked about the incident in Union Point, the appellant said he shot one officer in the stomach but didn't remember shooting anyone else. He stated he shot the officer because they were too lax and not paying attention to what they were doing. However, he said they had been nice to him. He further stated he had started to shoot the arresting officers but surrendered instead.

Appellant led officers back to the stolen patrol car but refused to show the officers where he hid the gun. He said in reply to their request, 'No murder weapon, no case.'

*Wallace v. State,* 248 Ga. 255, 255–57, 282 S.E.2d 325, 328–29 (1981), *cert. denied,* 455 U.S. 927, 102 S.Ct. 1291, 71 L.Ed.2d 471 (1982), *reh'g denied,* 455 U.S. 1038, 102 S.Ct. 1743, 72 L.Ed.2d 156 (1982).

## STANDARD OF REVIEW IN THIS COURT

Petitioner Wallace's conviction and sentence of death have been affirmed by the Supreme Court of Georgia, and state habeas relief has been denied. Petitioner now asserts that constitutional error, unrecognized by the courts of this state, occurred at his trial and should be recognized by this United States district court.

As succinctly stated in *Hance v. Zant,* 696 F.2d 940, 946 (11th Cir.1983):

The standard of review for habeas corpus petitions by prisoners in state custody is set out in 28 U.S.C.A. § 2254(d).[1] A written determination after a hearing on the merits of a factual issue, made by a state trial or appellate court of competent jurisdiction, is presumed to be correct unless one of the conditions set forth in Section 2254(d)(1)–(7) is found to

exist. If none of these conditions is found, or unless the state-court determination is 'not fairly supported by the record,' 28 U.S.C.A. § 2254(d)(8), the petitioner must establish by convincing evidence that the factual determination by the state court was erroneous. *Sumner v. Mata,* 449 U.S. 539, 546, 550, 101 S.Ct. 764, 768, 770, 66 L.Ed.2d 722 (1981). This presumption of correctness does not apply to legal findings or to mixed questions of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). Factual issues involve 'what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators...."' *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963), *quoting Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J). On the other hand, mixed questions of law and fact involve 'the application of legal principles to the historical facts of [the] case.' *Cuyler, supra,* 446 U.S. at 342, 100 S.Ct. at 1714. As Justice Frankfurter once stated: 'Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts ... the [Federal] Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.' *Brown, supra,* 344 U.S. at 507, 73 S.Ct. at 446 (opinion of Frankfurter, J.).

\* \* \* \* \* \*

---

[1] 28 U.S.C.A. § 2254(d) provides that:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record;

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

## ISSUES PRESENTED

### I. *Petitioner's Motion for an Evidentiary Hearing—The Baldus Study*

Petitioner, a black male convicted of murdering a black male policeman, moves the court to hold an evidentiary hearing to receive the so-called Baldus study in support of his claim that the Georgia death penalty statute is being applied arbitrarily and capriciously, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. In *McCleskey v. Zant,*

580 F.Supp. 338 (N.D.Ga.1984), the United States District Court for the Northern District of Georgia, in an exhaustive opinion authored by Judge Forrester, considered the merits of the Baldus study when offered in support of a contention identical to petitioner's.

■ Petitioner Wallace's state habeas petition was heard on May 13, 1982, in the Superior Court of Butts County, Georgia, and decided by written order dated August 5, 1982. The factual description of the Baldus study in Judge Forrester's opinion shows that Professor Baldus is a Professor of Law at the University of Iowa. He and a statistician authored a book entitled *Statistical Proof of Discrimination*, which was published by McGraw-Hill in 1980. The relevant study of the imposition of the death penalty in Georgia began in the late 1970's and seems to have been completed by May 13, 1982. Thus, although petitioner could have presented the Baldus study to the state habeas court, he failed to do so. Petitioner was afforded a full and fair opportunity for an evidentiary hearing by the state habeas court. He is not entitled to an additional opportunity to present evidence he could have presented but did not present to the courts of Georgia. Rule 8, Rules Governing Section 2254 Cases; 28 U.S.C. § 2254(d); *see, Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Petitioner's failure to present any evidence in a timely manner with respect to his claim of discriminatory application of the death penalty renders this claim meritless.

## II. *Ineffective Assistance of Counsel*

Petitioner alleges nineteen acts or omissions by trial counsel in support of his claim of ineffective assistance. These same allegations were argued to the state habeas trial court, wherein the following findings of fact were made:

Counsel were appointed in May, 1979, to represent Petitioner. (R. 11). In July, 1979, however, Edward E. Augustine was retained to represent Petitioner. (R. 23). Mr. Augustine had the case for 6 months prior to trial and was paid $10,-000.00.

Mr. Augustine represented Petitioner at both his trial on the special plea of incompetency and at his trial in chief. He was assisted at trial by attorneys Katrina Breeding and August Siemon. Ms. Breeding and Reverand [sic] General Lee Avery assisted Mr. Augustine in his pretrial investigation and preparation.

Counsel filed numerous pretrial motions. (R. 24–26; 31–44; 46–86; 120–125; 129–131).

At trial, Counsel made motions (T. 7; 8; 9; 23; 37; 206); gave an opening statement (T. 224–225); cross-examined State witnesses (T. 240; 248; 251; 264; 278; 281; 288; 305; 320; 329; 343; 367); presented one defense witness in the guilt/innocence phase but the testimony of the witness was stricken (T. 384); gave closing argument in the guilt/innocence phase (T. 423–440); presented three witnesses in the sentencing phase (T. 478; 494; 504); and gave closing argument in the sentencing phase. (T. 546–555(q)).

Mr. Augustine testified in the habeas proceeding that he did not present an insanity defense because the psychiatrists who examined Petitioner found him to have been sane at the time of the offense.

Prior to trial, Counsel filed a motion to suppress as evidence the rifles found in Petitioner's car on the night of his initial arrest in Union Point. (T. 347–364). At trial, Counsel challenged the admissibility of the weapons but did not claim that they had been illegally seized. (T. 347–364). The Supreme Court held that the weapons were admissible. *Wallace v. State, supra*, at 261(6) [282 S.E.2d 325].

Mr. Augustine employed Dr. James Woodford to examine the lab reports and the scene of the crime for physical evidence. Counsel testified that Dr. Woodford found nothing which could be verified so as to contribute to Petitioner's defense.

Mr. Augustine did not present testimony from psychiatrists at the sentencing phase of trial because he felt that the jury was aware of Petitioner's psychiatric problem from the guilt/innocence

phase, so he thought it was not necessary to put up psychiatrists. He stated that most witnesses could testify about Petitioner's condition from a lay standpoint.

Respondent's Exhibit 15, at 5–6.

Petitioner does not attack the presumption of correctness which § 2254(d) attaches to these findings. This trial judge has reviewed the entire record of petitioner's trial. Having done so, this court notes that petitioner's attorney, Edward E. Augustine, was recruited and paid a $10,000.00 fee plus some $1,400.00 in expenses by Reverend Avery, President of the local N.A.A.C.P. Mr. Augustine was assisted by volunteers Mr. August Simeon, an experienced criminal lawyer, and Ms. Katrina Breeding, a black female attorney then recently admitted to practice.

The district attorney permitted defense counsel to examine his investigative file. During the six months between being retained and commencing trial, Reverend Avery and Ms. Breeding interviewed every possible witness and endeavored to investigate petitioner and his background. All information so acquired was reported to Mr. Augustine.

■ Trial counsel and Reverend Avery uncovered no possible legal defense to the charge of murder. Their obvious strategy being to secure a sentence of less than death, they first asserted by motion a plea of incompetence to stand trial. Counsel attempted at a hearing on this special plea to prove incompetence both through psychiatric evidence and by testifying as to their own observations. The prosecution's witnesses testified as to their recent observations and experiences with petitioner; state expert witnesses testified as to petitioner's refusal to cooperate in psychiatric tests on advice of counsel. From all evidence adduced at the competency hearing the jury was authorized to conclude that while conclusory allegations of incompetency were

proffered, the petitioner's ability to communicate with others was such as to enable petitioner to assist in his own defense if he so desired. Defense counsel did not elect to call petitioner as a witness in this separate civil proceeding, and an inference may be drawn that petitioner's ability to communicate would have likely been suggestive of competency rather than incompetency. Defense counsel did all, in fact more, than counsel rendering effective assistance could be expected to do in trying the issue of petitioner's competency to stand trial.

■ During the guilt phase defense counsel, in spite of their personal protests and suggestions of being unprepared, demonstrated knowledge of the facts and circumstances that comes only from thorough investigation and preparation for trial. Counsel very competently cross-examined each prosecution witness. With no possible defense to the issue of factual guilt counsel did all that any lawyer could be expected to do in similar circumstances. There was no evidence in support of an insanity defense. Record at 102–103 (State habeas hearing). Petitioner's statements to the police were given after repeated *Miranda* warnings and a signed waiver of rights form. Moreover, defense counsel made a tactical decision to highlight petitioner's statement to the police, believing that it constituted some evidence in support of provocation and thus a manslaughter verdict. No suppression motion was called for under these circumstances. The remainder of plaintiff's guilt phase claims all concern evidentiary matters, none of which suggest any possible defense to the merits of the prosecution. Where no realistic defense on the merits exists, trial counsels' omissions will not compel habeas corpus relief, as the requisite demonstration of actual prejudice is absent. *Foster v. Strickland,* 707 F.2d 1339, 1342 (11th Cir.1983); *Washington v. Strickland,* 693 F.2d 1243, 1358 (5th Cir. 1982) (Unit B) (*en banc*). *See, Tucker v. Zant,* 724 F.2d 882, 894 (11th Cir.1984).[1]

---

**1.** Trial counsel at the state habeas hearing conceded that in the years following petitioner's conviction he had not uncovered any evidence or theory of defense which would have affected the outcome of the guilt trial had it been

presented originally. Record at 88 (state habeas hearing).

Petitioner's allegations of ineffective assistance of counsel at the sentencing phase of trial need not be discussed here for reasons set forth *infra.*

### III. *The Competency Hearing*

■ Petitioner challenges on constitutional grounds the Georgia procedure for determining competency to stand trial. Insofar as petitioner challenges the fact that the burden was placed upon him to prove his incompetence by a preponderance of the evidence, no violation of *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) occurred, as competency to stand trial is not an element of any charged offense. *See, Spencer v. Zant*, 715 F.2d 1562, 1566–67 (11th Cir.1983). Petitioner's procedural due process attack on Georgia's procedural scheme is without merit under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

■ Although petitioner implies that the change of venue order in the competency trial was racially motivated, no evidence has been offered to support this claim. The record indicates that pretrial publicity amply justified the change of venue order.

■ On cross-examination of petitioner's expert witness, Dr. Jacobs, the state was allowed to elicit an opinion as to whether petitioner was "responsible."[2] Petitioner contests the trial court's ruling by construing this testimony to be an improper comment on whether he was insane at the time of the crime in a guilt-innocence context. It is true that any question as to the petitioner's capacity to be responsible for the crime was not at issue in the competency trial. *Brown v. State*, 215 Ga. 784, 787, 113 S.E.2d 618, 620 (1960). The distinction between insanity and competency to stand trial is certainly susceptible to prejudicial confusion by the jury. However, the particular context of the exchange in this action adequately isolated the two issues. Petitioner's counsel objected on the ground that criminal responsibility was not at issue. The prosecutor conceded that it was not. The trial court remarked in open court that he did not perceive the question to relate to petitioner's responsibility for the specific crimes charged. The trial court also instructed the jury repeatedly that guilt or innocence was irrelevant in the competency trial. Under the totality of all these circumstances, no constitutional error resulted from the cross-examination of Dr. Jacobs.

The remainder of petitioner's challenges to the competency hearing all concern evidentiary rulings. Having failed to demonstrate fundamental unfairness, these claims are without constitutional merit. *Bryson v. Alabama*, 634 F.2d 862, 865 (5th Cir.1981 (Unit B).

### IV. *The Guilt Phase*

■ Petitioner challenges the trial court's refusal to allow petitioner's counsel to inquire on voir dire as to any membership by a prospective juror in a social organization which discriminated on the basis of race. However, it is apparent that petitioner already had access to this information in that the trial court allowed petitioner to submit written questionnaires to the veniere, which required each prospective juror to list all organizations to which he or she belonged. Although petitioner claims this questionnaire did not disclose the racial policies of local clubs, he has not proffered any evidence to this or any other court suggesting that an actual juror practices discrimination. Accordingly, petition-

---

**2.** [Prosecuting attorney] Q. Now, also at those meetings did you see any—you stated that you found that he was schizophrenic latent?

A. Correct.

Q. Based on that what was the consensus of the staff as to his responsibility?

MR. AUGUSTINE: Your Honor, I object. Responsibility is not an issue here.

MR. BRILEY: Certainly it is not, Your Honor. But Mr. Augustine has presented evidence about his mental state at the time he was eight years old and I think that we are entitled to fill in any gaps that we may be able to fill in where there is evidence to do so.

THE COURT: Well, I don't understand the term in the question as asked as being responsible for the crime. As a general responsibility, I think that is distinguishable. I overrule the objection.

BY MR. BRILEY:

Q. Did you find him to be responsible?

A. At the time of the 7/19 interview and on 9/6/79 it was my opinion that he was competent to proceed with the trial and that he was responsible.

er's claim under *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), is without merit.

■ Petitioner asserts that certain statements elicited from him by the police should have been excluded from evidence. The state habeas court ruled that this claim had been waived as it was not asserted at trial or on direct appeal, citing *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Petitioner responds by alleging that ineffectiveness of trial counsel was sufficient "cause" to excuse this procedural default. This court holds that not only is ineffectiveness of counsel inadequate "cause" under *Wainwright v. Sykes* (*see, Sullivan v. Wainwright,* 695 F.2d 1306, 1311 (11th Cir.1983)), but that petitioner's trial counsel made a tactical decision to offer petitioner's statements themselves as evidence in support of provocation and manslaughter. Record at 329–39. Petitioner's challenge to the constitutionality of his statements to the police is therefore barred from consideration here.

*Exclusion of Evidence of Mental Defect*

Petitioner challenges the trial court's refusal to admit evidence of petitioner's diminished mental capacity at the guilt phase of the trial. While not asserting legal insanity under O.C.G.A. §§ 16–3–2, 16–3–3, petitioner argues that evidence of mental deficiency is admissible as to the issue of "specific intent," citing *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir.1978). But murder under Georgia law is not a specific intent crime, as that term is used in modern parlance, and nothing in the Constitu-

tion requires Georgia to so define this crime.

Rather than affixing the terms of "specific intent" or "purpose" with respect to the *mens rea* required for murder, Georgia has opted for the common law requirement of malice aforethought,[3] which may be either express or implied. Malice murder at common law would not require what today is labeled "specific intent," as an act done with *reckless* disregard (or, as the Georgia statute provides, with an "abandoned and malignant heart") for the grave likelihood of causing death or serious bodily injury constituted malice.[4] Accordingly, evidence which disproves "purpose" or "desire" does not necessarily disprove malice aforethought. It is this distinction which renders *Hughes v. Mathews* inapplicable. *Hughes* involved the construction of Wisconsin's two-tiered murder statute. Under Wisconsin law, murder was divided into first and second-degree, with first-degree requiring a "purpose" to kill, and second-degree requiring a lesser intent of a "depraved mind" (*i.e.,* acts likely to kill and not caring whether one is killed or not). *Hughes,* 576 F.2d at 1252 n. 2. Since Wisconsin chose to define the offense of murder in this way, evidence of diminished mental capacity was admissible to disprove the element of "purpose" for first-degree murder. *Id.* at 1257 ("we conclude that in Wisconsin psychiatric testimony is relevant evidence on issues regarding a defendant's mental state including the question of whether the defendant had the capacity to form specific intent as opposed to general intent."). It would not be admissible, however, to disprove the mental element of

---

**3.** Malice murder under Georgia law is defined as follows:

    (a) A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.

    (b) Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.

O.C.G.A. § 16–5–1 (Michie 1982).

**4.** R. Perkins, *Perkins on Criminal Law* 46 (2d ed. 1969); W. LaFare & A. Scott, *Criminal Law* § 67 at 528 (1972). While one reported Georgia case states that "recklessness" cannot constitute malice for murder purposes, *Foster v. State,* 239 Ga. 302, 236 S.E.2d 644 (1977), it is clear that this language was limited to the issue of "reckless" *driving,* as another statute had expressly provided for homicides caused by reckless operation of a vehicle.

second-degree murder, *i.e.,* "general" or "depraved mind" intent. *Id.* at 1252.

■■■ As noted, Georgia has not distinguished between homicides committed with a purpose to kill and those committed with a depraved mind/abandoned and malignant heart—both are murder under Georgia law.[5] Thus, evidence which might disprove purpose is relevant only if it also disproves that conduct was undertaken with a conscious disregard for the strong likelihood of causing death, even if no particular intent to kill is alleged. *See,* W. LaFave & A. Scott, *Criminal Law* § 42 at 329 (1972). Counsel for petitioner in the offer of proof did not suggest that petitioner's mental defect prevented him from knowing that the use of a firearm created a grave likelihood of causing death. While his diminished mental capacity could have distorted the reality of the situation, petitioner's use of the weapon in dealing with his perception of reality is evidence that he knew the probable outcome of that act. Since evidence of his mental defect would not have disproved this manifestation of malice, the evidence was properly excluded.

### *The Jury Charge on Malice and Intent*

[12] The petitioner raises the recurring challenge to the standard jury instruction regarding the presumption of intent. The trial court, after explaining that malice was an essential element of the crime, gave the following contested instruction:

> I further charge you that intent to commit the crime charged in this indictment is an essential element the State must prove beyond a reasonable doubt. Intent is always a question for the Jury and is ordinarily ascertained by acts and conduct. Intent may be shown in many ways provided the jury finds it existed from the evidence before them. It *may* be inferred from the proven circumstances or by acts or conduct and it *may* be presumed when it is the natural and necessary consequence of the acts.

---

5. *Myrick v. State,* 199 Ga. 244, 248, 34 S.E.2d 36, 39 (1945) ("A presumption of malice may arise from a reckless disregard for human life. A wanton and reckless state of mind is sometimes the equivalent of a specific intent to kill....").

Record at 459 (February 13–15, 1980) (emphasis added). Use of the phrase *"may* be inferred" and *"may* be presumed," considered in the context of the entire charge, resulted in a permissive presumption which did not unconstitutionally shift the burden of proof to petitioner. The language is identical to that found constitutional in *Hance v. Zant,* 696 F.2d 940, 953 (11th Cir.1983) and *Lamb v. Jernigan,* 683 F.2d 1332, 1340 (11th Cir.1982). It is unlike the language found constitutionally suspect in *Sandstrom v. Montana,* 442 U.S. 510, 513, 99 S.Ct. 2450, 2453, 61 L.Ed.2d 39 (1979) ("the law presumes"); *Franklin v. Francis,* 720 F.2d 1206, 1209 n. 2 (11th Cir.1983) ("The acts of a person of sound mind and discretion *are* presumed to be the product of the person's will.... A person ... *is* presumed to intend the natural and probable consequences of his acts....." (emphasis added)); and *Mason v. Balkcom,* 669 F.2d 222, 225 (5th Cir.1982) (Unit B) ("the law presumes"). Accordingly, this claim is without merit.

This court has carefully considered petitioner's remaining allegations of error relative to the guilt phase of trial, and finds that none present a constitutional basis for habeas corpus relief.

### V. *The Sentencing Phase*

Petitioner has asserted numerous allegations of error relative to the sentencing phase of his bifurcated trial. Because this court must find the argument of the prosecutor in support of the death penalty constitutionally infirm, most of these allegations need not be discussed.

The petitioner asserts that the prosecutor's closing argument at the penalty phase was inflammatory, was based on considerations irrelevant to the sentencing determination, and resulted in a fundamentally unfair sentencing proceeding.

---

Perhaps a more accurate statement would be that reckless disregard for human life is an *alternative* basis of malice, which could also be proved by a specific intent or purpose to kill.

The scope of permissible argument in the penalty phase of a capital case in Georgia has been discussed in three recent decisions of the Eleventh Circuit Court of Appeals. *Tucker v. Zant,* 724 F.2d 882 (11th Cir. 1984); *Brooks v. Francis,* 716 F.2d 780 (11th Cir.1983); *Hance v. Zant,* 696 F.2d 940 (11th Cir.1983). According to those Eleventh Circuit decisions three factors are to be considered by this court in determining whether or not the prosecution's argument deprived petitioner of the constitutionally fair trial he was entitled to: "(1) the degree to which the challenged remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether they are isolated or extensive; [and] (3) whether they were deliberately or accidentally placed before the jury...." *Hance,* 696 F.2d at 950 n. 7.

The prosecutor in the instant action made a detailed, and what must be found as an intentional, argument as to the effect of the jury's verdict on third parties:

We like that [courteous] kind of people for peace officers. We don't want one who grabs a man, cuffs his hands behind him for a traffic accident or traffic incident; we don't want one who treats a traffic offender like he was a felon because all of us at some time or another are going to come in contact with a police officer. And most of it is going to be in some misdemeanor act. Maybe we run a "Stop" sign or we got in a little hurry going to town, we're running late to work and we speed a little bit and we want that officer to approach us. We want him to be considerate. We don't expect him to come up there with his gun in his hand. We don't want that. And I hope we never have to have it. But if we don't enforce the laws of the state of Georgia protecting these peace officers so they can go about their jobs in a courteous manner beneficial to all of us, then they are going to have no choice but to get out of their automobile with a right [sic] gun in their hand with their partner there, poke that gun barrel in the head of every offender and have their partner handcuff his hands behind him and drag him off to jail like a felon.

That's the only protection they are going to have, if ladies and gentlemen like yourselves who sit on Jurys don't say it stops here. We will protect our peace officers. We want them to be able to conduct their duties in a reasonable manner in a courteous manner without being afraid that every crazy mean rascal is going to come along with a car load of guns in [sic] going to blow him away at the first opportunity just because he doesn't want to be placed in lawful custody.

That's the situation. That's how serious it is. A case like this affects the ordinary person in the community more. It affects him more than the murder of a private citizen. It's not any worse. The crime is not any worse, but its affect is worse. Now, there's none of us, well, maybe some of you, but most of us have had contact with police officers. Sometimes we've had one that might have been sharp, discourteous. And sometimes they might have had to take action that hurt us. But, ladies and gentlemen, by and large the police officers of this state, this community are out to protect us. Some of them do it in a way that sort of grates on us sometimes, but they're out to protect us. They're not high-paid individuals, they're not floating in money. Many of them work out of dedication. They do a job well out of dedication. Because they're dedicated to their responsibility in maintaining a safe community, safe roads and highways and safe homes for all of us. They deserve our attention. They deserve our support. And above all else, they deserve the protection that can be provided them by Juries who believe in justice and seeing that justice is done to provide them that protection.

Record at 524–26.

▪ The adverse effect that a recommendation of mercy (as opposed to death) will have on third parties, such as prison guards, youthful offenders incarcerated with the defendant, or the citizenry at large in the event of parole or escape, is an improper argument in a death penalty case.

Such considerations do not focus upon the characteristics of the defendant himself or the circumstances of his crime. *Tucker, Brooks, Hance, supra.* It is clear that the prosecutor's argument here alluded to a perceived adverse effect that a verdict granting mercy would have on police officers in the manner in which they treat law-abiding citizens in situations not otherwise calling for force or restraint. This argument clearly implied that the members of the jury should fear for their own safety if they declined to impose the death penalty.

Given the constitutional limits placed upon a prosecutor's argument for the death penalty, as articulated in *Tucker, Brooks,* and *Hance, supra,* this court is compelled to hold that the argument in the instant action exceeded those limits. The only relevant issue in a capital sentencing proceeding is the particular circumstances of the defendant and his offense. *Lockett v. Ohio,* 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978). The fears and passions of the jury cannot be excited by speculation as to what might happen if the death penalty is withheld. Accordingly, the prosecutor's arguments in this case denied petitioner the constitutionally mandated fundamentally fair sentencing proceeding; the death penalty resulting therefrom cannot stand. As noted, this ruling renders a discussion of petitioner's remaining challenges to the sentencing proceedings unnecessary.

## CONCLUSION

Petitioner has failed to demonstrate any constitutional infirmity warranting federal habeas corpus relief with respect to his convictions for murder, aggravated assault, motor vehicle theft and driving under the influence. However, petitioner's death sentence must be set aside due to the constitutionally impermissible arguments of the prosecutor in the sentencing proceeding.

Accordingly, within 180 days from this decision becoming final because of expiration of time to appeal or the issuance of a mandate affirming this order, whichever is later, respondent shall cause petitioner to be retried on the question of what sentence should be imposed for the crimes for which petitioner's guilt has already been constitutionally established. The respondent shall keep the clerk of this court apprised of the manner in which this order is being complied with. If respondent fails to comply, petitioner may make a written motion for the issuance of a writ of habeas corpus discharging him from custody and, absent good cause shown, it shall issue.