**Robert William STRICKLAND,**
**Petitioner-Appellant,**

v.

**Robert FRANCIS, Warden,**
**Respondent-Appellee.**

No. 83–8572.

United States Court of Appeals,
Eleventh Circuit.

July 31, 1984.

---

Millard C. Farmer, Joseph M. Nursey, Atlanta, Ga., for petitioner-appellant.

Susan Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

The petitioner, Robert Strickland, challenges the district court denial of his petition for a writ of habeas corpus. In 1980 Strickland was convicted in the Superior Court of Hall County, Georgia, on three counts of murder and three counts of aggravated assault and was sentenced to death. After exhausting his state reme-

dies, Strickland filed the instant petition for a writ of habeas corpus challenging his state court convictions and sentences on a number of constitutional grounds.[1] We reverse and remand to the district court with instructions to grant the writ of habeas corpus because Strickland was incompetent to stand trial at the time of his conviction in 1980.

## I. INTRODUCTION

The Supreme Court has long held that the trial and conviction of a person legally incompetent to stand trial violates the due process of law requirements of the Constitution. *See Drope v. Missouri,* 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103 (1975) (discussing historical origins to the rule and stating that the prohibition of a criminal proceeding against a mentally incompetent defendant "is fundamental to an adversary system of justice"). The Court in *Drope* articulated the constitutional prohibition as follows:

[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.

420 U.S. at 171, 95 S.Ct. at 903. *See also Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). The weight of this prohibition is further illustrated by the holding in *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), that the state courts must hold a hearing on the competency issue whenever the evidence raises a "bona fide doubt"

---

1. Strickland argues that: (1) he was denied due process because he was incompetent to stand trial at the time of his 1980 conviction; (2) the trial court improperly excluded two jurors under the principles of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (3) the trial court's jury instructions at the guilt/innocence phase violated the principles of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); (4) the trial court erred in failing to grant Strickland's request for a jury charge on the lesser-included offense of voluntary manslaughter; (5) the state denied

him a right to a fair trial by refusing to grant a continuance during the sentencing phase of the trial to allow Strickland's attorney an opportunity to present psychiatric testimony on Strickland's psychiatric problems and prospect for rehabilitation; and (6) Strickland's attorney failed to investigate or present mitigating evidence at the sentencing phase of the trial and thereby rendered ineffective assistance. We address only the incompetency claim, because our finding of incompetency entitles Strickland to habeas relief and moots the remaining issues.

as to the defendant's competence. *Id.* at 385, 86 S.Ct. at 842.

In the instant case, the petitioner entered a special plea of incompetency to stand trial. Pursuant to Ga.Code Ann. § 27–1502(a) (recodified at Official Code of Ga. Ann. § 17–7–130(a) (1982)), the trial court submitted the issue to a special jury.[2] After a trial at which both the petitioner and the state presented witnesses, the jury returned a general verdict that petitioner was competent to stand trial.

After careful and exhaustive review of the record, we conclude that there was insufficient evidence to support the jury's competency determination. The overwhelming evidence at Strickland's competency trial mandates the conclusion that Strickland was not competent to stand trial and the state violated his due process rights by subjecting him to trial at that time; only the extreme deference we owe to the state court's determination makes this a close issue. *See Maggio v. Fulford,* 462 U.S. 111, ___, 103 S.Ct. 2261, 2264, 76 L.Ed.2d 794, 799 (1983); *Marshall v. Lonberger,* 459 U.S. 422, 434, 103 S.Ct. 843, 850, 74 L.Ed.2d 646, 658 (1983); *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981); *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1981). *See also infra* Part III.A.

## II. THE COMPETENCY HEARING

### A. *Strickland's Case*

At the state competency trial, seven witnesses testified on Strickland's behalf.

Four of those witnesses were members of Strickland's family. All four testified that Strickland had a history of mental problems dating back to 1967. These witnesses also testified that Strickland had engaged in a number of bizarre activities in the preceding years. Since 1975, Strickland had received psychiatric treatment, although that treatment was frequently interrupted by a lack of finances. All four of the witnesses had visited Strickland at the jail many times before trial and, although they testified that he was occasionally able to communicate rationally on routine family matters, those visits were often characterized by periods during which Strickland had no grasp of what was going on around him or where he was. The four all testified that Strickland was unaware of the proceedings against him and totally unable to communicate on any matters relating to the crime or the pending trial.

Strickland's attorney, Mr. Crudup, testified that he visited Strickland on numerous occasions in the jail. He testified that Strickland had some periods of rational behavior on routine matters, but also noted that Strickland suffered from frequent periods of irrationality and delusions that he was being persecuted by the CIA. Most importantly, Crudup testified that Strickland was never able to communicate in any fashion about the incidents relating to his arrest or pending trial; and that Strickland was never able to assist Crudup in the preparation of a defense. Trial transcript at 336–41.[3]

---

2. The Georgia statute provides:

   Whenever a plea is filed that the defendant in a criminal case is mentally incompetent to stand trial, it shall be the duty of the court to cause the issue of the defendant's mental competency to stand trial to be tried first by a special jury.

3. Crudup described conversations with Strickland as follows:

   It would be difficult for me to explain to you what a conversation would be like with him, but I can attempt to. He is obsessed with certain terms, verbiages that he uses, that are nonsense to me.

   When you try to talk to him, he tries to make use of those terms, and you can't get any sense out of him. For instance, there is a word that he constantly uses, and I have no way of knowing what he means by it, but the word is "supplemental".

   He will inject "supplemental" continuously in any conversation. As a matter of fact, he will use that in response to a question of how you are feeling.

   I believe it was this last Friday or Saturday that I talked with him, and my first statement to him was, Robert, how are you feeling, and he said "supplemental".

   I asked him what he meant by "supplemental", and he went into a long dissertation, involving nonsense.

The most significant testimony Strickland offered was that of two experts, both members of the Forensic Services team in Georgia. The doctors were both state employees and had examined Strickland under a court order to assist in reaching a competency determination.[4]

Dr. Ermutlu, a board certified psychiatrist, who at the time was director of forensic services for the Georgia Mental Health Institute, examined Strickland on three occasions. The last examination took place five days prior to Dr. Ermutlu's testimony.[5] He discussed in detail the findings of those examinations and stated that Strickland was suffering from a psychotic disorder.

*Id.* at 200. When asked whether Strickland was able to understand the proceedings and assist his attorney in a defense, Dr. Ermutlu unequivocally stated that Strickland was not capable of so doing at that time. *Id.* at 189–90, 401, 403.

Dr. Eichler, the senior psychologist for the Georgia Mental Health Institute, examined Strickland five times. His last examination took place on the third day of the competency hearing following an in-court outburst by Strickland, during which Strickland had overturned the defense table and had to be forcibly removed from the courtroom. *Id.* at 226.[6] Dr. Eichler testified in detail about his findings from

---

Trial Transcript at 327. *See also id.* at 403, where Dr. Eichler described Strickland's frequent use of the term "supplemental" in conversations, evidencing in the doctor's opinion "a certain disorganization of thought process."

Crudup's testimony was also descriptive of Strickland's ability to assist in preparing a defense:

I have asked him, in detail, about the case. He has no recall about it at all. Sometimes he doesn't even respond. Other times, he will respond, but it will be nonsense.

Occasionally, he will come up with something that is halfway rational, and I recall on one particular day I asked him what kind of witnesses that he thought we could use, regarding the incident.

He didn't know what incident I was talking about, and I told him, regarding the murders of the Carroll family, and he said that he didn't think anybody in the Carroll family had been murdered.

Then we discussed it further, and then I said, well, haven't you been told that—by other people or by reading the paper or something—that this happened.

He said that he thought that on one or two occasions somebody had told him that. I said, is there anybody that we could use as a witness. He started talking about it, and he suggested that one of the witnesses we could use was in fact one of the persons that had been murdered.

*Id.* at 328–29.

Regarding Strickland's appreciation of the nature and consequences of the charges against him, Crudup responded on cross-examination:

You asked me if I advised him about the consequences of this thing, and I did, and I got a strange response from him about that. I told him that this was an offense that he could be electrocuted for, and he told me that if he was electrocuted, that his soul and his body would be fused together for nine years

before his soul could be released from his body.

*Id.* at 339.

Finally, Crudup verified the testimony of other witnesses that Strickland's condition deteriorated throughout the period of confinement preceding trial. *Id.*

4. The Forensic Service Department in Georgia, under agreement with the state courts, is to provide assistance in reaching various medical and psychological determinations relevant to criminal trials. As to the specific issue of competency, the Forensic Services team is to evaluate the defendant to determine:

1. That the defendant is aware of the nature of the charges against him and the possible consequences,

2. That he is capable of sufficient communication with his attorney so as to prepare a defense,

3. That he is capable, with his attorney's guidance, of regulating the proceedings to himself, and

4. That he has sufficient working knowledge of the role of the court and its various participants.

The findings will conclude the defendant is competent for trial, incompetent for trial, or that hospitalization is needed for further evaluation or treatment.

Respondent's Exhibit 23 at 1176–78.

5. Dr. Ermutlu also had occasion to observe Strickland during the competency proceeding and was testifying on rebuttal during Strickland's second in-court outburst. *See infra* note 6.

6. After the defendant's outburst, the court ordered Dr. Eichler to examine the defendant to determine whether he could be brought back into the court for the remainder of the proceedings. *See* Trial Transcript at 227–57. The court ultimately allowed Strickland to return to the courtroom. However, two days later after a

the examinations and various tests he had administered to Strickland. He testified that the examinations and test results, in combination with Strickland's observed behavior and past psychological history, established that Strickland was suffering from a severe mental disorder. *Id.* at 304–07. Dr. Eichler, in responding to questions regarding Strickland's ability to understand the proceedings and assist in his defense, stated on a number of occasions that Strickland was out of touch with reality and totally incapable of assisting in his defense. *Id.* at 234–37; 300–01; 424. As to the certainty of the diagnosis, Dr. Eichler testified that, although professionals often disagree on a diagnosis, in Strickland's case, both doctors "were so overwhelmed with the consistency of his behavior, his mood, his history, that there was no question in our minds." *Id.* at 324.

### B. *The State's Case*

The state conducted rigorous cross-examination of the doctors and introduced the testimony of seven lay witnesses. In the

---

second in-court outburst, Strickland was removed from the courtroom and not allowed to return for the remainder of the competency proceedings. *Id.* at 406.

7. Pursuant to the court order, *see supra* note 4 and accompanying text, the doctors had filed a report with the court on Strickland's mental condition. That report was never introduced into evidence at the competency trial, but is part of the record in the instant habeas petition. As to the specific issue of competency, the report stated:

> From a strictly technical point of view, he may pass the test in terms of understanding the charges against him and appreciating the consequences thereof. Even though his ability to communicate with his lawyer to assist him in his defense is somewhat limited due to a certain degree of suspiciousness and due to the difficulty he is experiencing in recalling the events which led to his arrest, Mr. Strickland has the capacity to relate, as proven by his interchange with the examiners .... However, we are seriously questioning his ability to cope with the pressures of the trial, especially facing the possibility of his ex-girlfriend's testimony. We consider him a serious suicidal risk and suggest extreme precautions to prevent an impulsive act against himself. As you know, he has already made an attempt to overdose himself.
>
> \*   \*   \*   \*   \*   \*

cross-examination of the doctors, the state attempted to show a discrepancy between the doctors' initial report and their current testimony regarding Strickland's inability to relate to his attorney or understand the proceedings against him.[7] Both doctors responded that notwithstanding what was said earlier in the report, Strickland's condition had so worsened from the time of their initial examinations that they were resolute in their conviction that he was incompetent to stand trial. *Id.* at 188, 191–93, 198, 204, 302–03, 313, 414.[8] Both doctors also explained that their earlier report was consistent with their current opinion in that the doctors had recommended treatment, which they felt was necessary for Strickland to attain competency to stand trial. Strickland had not received that treatment; his condition had worsened; and the doctors testified that, consistent with their initial belief, Strickland was not competent to stand trial. *Id.* at 196, 204, 302–03, 310, 314–15.[9]

The state's lay witnesses can be divided into three groups. Three of those witness-

---

> In conclusion, in our opinion, Mr. Strickland needs active psychiatric care and protection from his suicidal tendencies.
>
> Respondent's Exhibit No. 24.

8. Dr. Ermutlu stated, for example, that regardless of what was said in the earlier report: "I have to qualify my statement, in that respect, that I am more pessimistic about that statement since I wrote that report, especially after I saw him last week." *Id.* at 198. And again: "My observations during the last visit, Wednesday of last week, I found him to be more agitated and more disturbed and sicker than when he was when I saw him the first time." *Id.* at 188. In addition to other comments, Dr. Eichler stated: "I also believe [that since the first report] his ideas about the CIA are more fixed, more firm in his mind ... more fixed and more encompassing, involving everyone and everything." *Id.* at 303.

9. For example, in the cross-examination of Dr. Eichler, the following dialogue took place regarding the earlier report.

> Q: And I believe your report, that you and Dr. Ermutlu affixed your signatures to, and then sent to us, which reflected your findings and your diagnosis, stated that he did have the capacity to relate, did it not?
> A: It did.
> Q: And you state that your opinion hasn't changed since you wrote that report, is that correct?

es related events that had occurred at the time of the crime and Strickland's arrest. Thomas H. Mefford, a detective with the Hall County Sheriff's Department, stated that he was present when Strickland was arrested and that Strickland wondered why he was arrested because he was going to "give himself up." *Id.* at 380–81. Michael Latt, a dispatch officer with Hall County, testified that he received a telephone call on the day of the murders and that the caller had said that an ambulance was needed at the murder scene. The caller had further stated, "I'm the one who did it and I am insane." *Id.* at 391. Steve Howard, another Hall County detective, testified that he visited the murder scene and found that the telephone in the residence had been shot and was not functioning. *Id.* at 397.

The second group of three witnesses related the events surrounding an alleged suicide attempt by Strickland on March 10, 1980, while he was in jail. Drs. Eichler and Ermutlu had relied in part on official reports of that suicide attempt in reaching their initial diagnosis and treatment evaluation.[10] Jack Porter, a Hall County deputy sheriff, testified that he sent Strickland to the hospital after Strickland told him that he took an overdose of pills and then passed out. *Id.* at 352. Dr. Westmoreland, the physician who examined Strickland after the suicide attempt, said that he was unable to find traces of a drug overdose, although he also was unable to account for Strickland's obvious lethargy and incoherence at that time. *Id.* at 356.[11] Another jailer, Robert Cobb, testified that he also observed Strickland on March 10 and, al-

though he was unable to arouse Strickland, it was Cobb's opinion that Strickland had not taken an overdose. Cobb also testified that prior to March 10 he had observed Strickland in normal conversations with other prisoners, but that Strickland had once started a fight with a cellmate and had to be moved to another cell. *Id.* at 362–65. Cobb did not see Strickland at all in the two months preceeding the competency hearing.

Finally, Sylvia Ladd testified for the state. Mr. Ladd was a jailer in the Hall County Jail where Strickland had been incarcerated from the time of his arrest and throughout the competency hearing. Ladd had opportunities in his capacity as a jailor to observe Strickland five days a week throughout this period.

Ladd testified that at times Strickland appeared rational and was in fact very cooperative at the jail. *Id.* at 371. Ladd further stated that Strickland would go into periods of extremely irrational behavior—walking the floors, laughing out loud, and howling through the night—but correlated these episodes with "big court" times. *Id.* at 369. Ladd also testified that Strickland would calm down when told that upcoming court proceedings would not involve him. Ladd concluded:

> Robert, through these episodes that came up during—just before court, and all like that, I think it was put on. Robert is intelligent, he's not crazy.

*Id.* at 372.

C. *Rebuttal*

Strickland brought back both doctors for rebuttal. In response to a question on

---

A: I think we said he could relate, but that he did not show the ability to discuss rationally his situation with his attorney, in order to prepare a defense. We said he could enter, theoretically, into a trusting relationship, if he were given enough time and treatment. I believe that is what we suggested.
Trial Transcript at 310.

**10.** In arriving at their conclusion that Strickland was suicidal, Drs. Ermutlu and Eichler had, in addition to the reported suicide attempt at the jail, relied on Strickland's past medical history—which was compiled by other doctors prior to Strickland's arrest, numerous other re-

ported suicide attempts, and their own examinations and testing of the petitioner.

**11.** Dr. Westmoreland also examined Strickland after the in-court outburst that had caused Strickland's removal from the courtroom during the competency trial. He testified that Strickland had appeared calm when the doctor first approached him. As soon as the doctor tried to place a cuff on Strickland's arm to check his blood pressure, however, Strickland exploded and began yelling that the doctor was a CIA agent and trying to hurt him. Trial Transcript at 357.

Strickland's intelligence, Dr. Eichler testified that Strickland had a tested I.Q. of 73, three points above mental retardation. *Id.* at 415–16. When presented hypothetically with all of the acts described by the state's witnesses, both doctors testified that these acts were consistent with their diagnosis of his mental disorder. *Id.* at 398–401, 413–15.[12] Dr. Ermutlu even testified that the observations related by Ladd and the other witnesses fortified the doctors' diagnosis of Strickland's severe mental impairment. *Id.* at 411.[13] Neither doctor altered his earlier

12. The dialogue that occurred when Dr. Ermutlu was testifying on rebuttal is enlightening.

Q. Doctor, you are still under oath. With respect to Robert's condition and the evaluation that you have given him, if the guards at the jail had noticed him during an exercise program walking normally, and if the guards had engaged him in what they termed normal conversation, from time to time, how would you relate that to Robert's condition and the evaluation that you placed on him?

A. It is feasible that a person does not show the symptoms of his illness on a twenty-four hour basis. There are moments that person is with himself and can look from outside fairly quiet, and it would be difficult for an untrained person who is not dealing or inquiring about the issues to find out about how a person's mind is working.

Q. Would the fact that he had assisted in cleaning a commode last night at the jail with a coat hanger, and as the guard said, was very cooperative, would that indicate anything to you, out of the ordinary, with respect to Robert?

A. I do not consider it significant evidence to indicate mental health, necessarily.

Q. Would the fact that, as one of the guards from the jail said, that in his opinion he was fooling or faking or whatever, because he would howl like a dog, each time, as he said, court approaches, and when engaged in conversation by that guard and told him to quit howling, Robert said that he howled instead of crying. Is that significant to you in any way?

A. It means a certain form of communication on the part of the defendant. I have seen him cry during my interviews. There were times that he was rather depressed.

*        *        *        *        *        *

Q. Is it your considered opinion that the stress of this situation is a thing that makes Robert break?

A. The major causes of mental illness, one of them, at least, is strong pressure, heavy stress, that a person finds himself in, in terms of security, in terms of acceptance, things of that nature, and if the stress is too much, the mental capacity of the individual, whose defenses are already weakened, further dwells in the depths of illness.

*        *        *        *        *        *

Q. Is it your opinion that under the stress of a trial he would be able to communicate with me at all and deal rationally with defending the case?

A. If I may explain, step by step, the process a person goes through in dealing with this situation, I might be able to answer your question better.

To be able to deal with some events [sic] ... you have to be able to receive it and analyze it, reach some conclusions, and then communicate that conclusion [sic] to whoever the person has to communicate.

Excessive anxiety interferes with the—all these processes. It is difficult to test reality or hear exactly what is being said and take it exactly as it is, without distorting the content.

Then the anxiety itself, the tension, prevents a logical analysis of whatever is heard, whatever is taken, and reach [sic] a common sense conclusion, as a result.

This is why we always feel that decisions made under anxiety are full of danger or wrong action. From this point of view, I feel that Mr. Strickland's condition, at this time, is such that he will not be able to perform in this manner, to meaningfully participate in his defense.

Q. Is it significant to you that there has been testimony that back in November, or December, when the incident occurred, that he might of called on the telephone and said there are five to eight dead people out there, send an ambulance, I shot them, I'm crazy? Is that significant to you, with respect to his condition now?

A. I don't necessarily connect that picture, that period, with now. I haven't [sic] seen him at the time this situation occurred. His problem has a cyclic nature.

In other words, he goes through cycles, low periods, high periods. He may look reasonably all right for a period of time, but then things may develop. His response may become psychotic. So, I'm basing my opinion, in terms of competency issue, on his present condition.

Trial Transcript at 398–402.

13. Dr. Ermutlu stated:

Well, I think, as I mentioned before, a person with mental illness can have lucid moments. However, I would like to mention that a person who wants to fake, in my own experience, in cases similar in this nature, most often they give themselves away, by overdoing it.

I expect that if a person wants to fake mental illness, he would not want to show the healthy side of him to the people who are directly involved.

Trial Transcript at 411.

testimony that Strickland was unable to understand the trial going on around him and unable to assist in his defense. In response to the state's suggestion that Mr. Strickland might be feigning his symptoms, the doctors noted the factors that, in their minds, conclusively removed this as a possibility. *Id.* at 204–07, 250, 315–17, 324, 400, 405–06, 411.[14]

14. The doctors both testified in detail about their extensive efforts to determine whether Strickland was faking, and their firm conclusion that he was not. For example, Doctor Ermutlu testified:

Q. Now, there has been some question during the voir dire examination that a person can fool a psychiatrist. Can you respond to that?

A. It is possible for someone to present a picture that can, using your term, fool somebody, but there has to be some conditions for this to be accomplished.

First of all, the person should have a fair amount of knowledge of mental illness to be able to mimic or imitate the picture of psychosis. ·

Second, experience shows that it is very difficult for a person to do that in a consistent manner, if he was seen a number of times and examined in depth.

Thirdly, certain tests that we have used, it would be almost impossible for a person to fake, in other words, because some of these tests are designed just to locate fakers. The same type of questions are given to the individual a number of times, in different forms, and inconsistencies are picked up.

I think, ordinarily, a psychiatrist who sees an individual usually takes a person's word, and if someone comes to you seeking help, you don't have any reason to doubt what the person is saying, but in your [sic] work, we have to keep it in mind that this is a possibility.

If a person shows himself as a sick person, that may help him with the process here, so in medicine there is a rule, that if you keep in mind a certain possibility, you have a little bit less chance to miss that point, and in forensic medicine, this is one of the basic issues that we keep very much in mind and try to detect the possibility of faking.

\* \* \* \* \* \*

Q. Explain to the jury what you mean by a patient would have to have knowledge of mental disease or disorder in order to fake it.

A. He needs to be fairly familiar with certain disease processes and the symptoms of psychiatric disorders, and be able to maintain at a very conscious level a certain consistency.

I would like to say that we do not reach a conclusion when we examine a person strictly from what the individual says. There are a number of things that go on when you are talking to the individual. You listen to what the person is saying, and you see how he is saying it, what sort of emotional content is involved in what he is saying.

Then the actual content, whether it is logical, whether it is fitting to a certain emotional content, and then this whole behavior involves various movements, face muscles, expressions, body language.

Then all of these elements would have to fit together. A person may say I'm feeling this and that way, but there has to be a very close relationship between total performance.

This is why I'm saying that it is very difficult to maintain the consistency, especially when you see the individual at different stages, at different points, that he can maintain this kind of a picture.

. . . . .

Q. ... Could you state to the jury whether or not you feel that Robert has fooled you in any way?

A. I haven't gotten the feeling that he was telling me things that he didn't believe. First of all, the overall picture that he presented, and the history that he gave me, was corroborated by the documentation of other physicians and the mental health center records. I did not feel, necessarily, that he was not telling me the truth.

Q. And that history substantially predates the charge against him?

A. That's correct.

Trial Transcript at 204–08.

Dr. Eichler testified regarding the experts' certainty that they had not been fooled as follows:

Q. Can you rule out the possibility, not the probability, we'll get to that, but can [sic] rule out the possibility that Robert is fooling you, to any extent?

A. Yes.

Q. You can rule that out?

A. We believe we can rule it out.

Q. Why is that?

A. Because, for one thing, he is not skilled enough to understand how to be, in other words, how to have the symptoms that he has, and to show the emotional, the affective qualities that he displays. His IQ level is not high enough to justify his being able to do that. *Id.* at 316–17.

In all, at various points in their testimony, the doctors referred to five factors that indicated to them that Strickland could not be feigning his symptoms.

1. To fake Mr. Strickland's disease, one would have to be very aware of its symptoms. Trial Transcript at 203.

2. The diagnosis of Mr. Strickland's condition was consistent with medical reports dating back to 1975. The symptoms had been

Both sides rested. The jury returned with a verdict that stated "we, the jury, find against the special plea of insanity filed by Robert William Strickland." *Id.* at 430. The Georgia Supreme Court affirmed. *Strickland v. State,* 247 Ga. 219, 275 S.E.2d 29, 33 (1981). The state habeas court rejected Strickland's competency challenge, noting that the Georgia Supreme Court had already determined the issue. Without holding an evidentiary hearing, the district court also denied relief on this claim.

## III. DISCUSSION

### A. *Standard of Review*

The state urges that we review the jury's competency determination under the standard articulated in *White v. Estelle,* 669 F.2d 973 (5th Cir.1982), *cert. denied,* 459 U.S. 1118, 103 S.Ct. 757, 74 L.Ed.2d 973 (1983).[15] The court in *White* stated that a federal court on habeas review of a state jury finding of competency must view the evidence in the light most favorable to the jury verdict and "must ask whether any rational trier of fact could conclude that the evidence does not predominate in favor

of the appellant's claim of incompetency." *Id.* at 977 (adhering to the standard described in *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979) (discussing the proper standard of review of state prisoner's claim that there was insufficient evidence of intent to justify his conviction)). Strickland argues that competency to stand trial is a mixed question of law and fact and we should evaluate the jury's determination under a more stringent review standard. *See Lokos v. Capps,* 625 F.2d 1258, 1267 (5th Cir.1980); *United States v. Makris,* 535 F.2d 899, 907–08 (5th Cir.1976) ("[i]t would be improper for a federal court to give conclusive weight to a state court finding of competency without reanalyzing the facts. * * * In the final analysis, the determination of competency is a legal conclusion."), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977). We need not choose between the possibly conflicting standards urged by the parties because even under the extremely deferential standard articulated in *White,* which affords the state determination every reasonable hypothesis of correctness, we find insufficient support for the jury's determination.[16]

manifest for sometime and did not occur suddenly when the defendant was placed in jail. *Id.* at 203, 249, 398–403.

3. Strickland performed consistently on a battery of tests administered by the doctors. *Id.* at 203. The doctors, because of the legal consequences of their finding, were extremely sensitive to the possibility of faking and found none.

4. Strickland's I.Q. was too low for him to convincingly "fake" a mental disorder of this magnitude with such consistency. *Id.* at 317, 416–17.

5. If anything, the observations of rational moments supported the conclusion that defendant was not putting on. *Id.* at 411.

**15.** *White,* which was decided by the Fifth Circuit after September 30, 1981, is not binding on this court. *Cf. Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

**16.** Because we conclude that there was insufficient evidence to support the jury verdict under the *Jackson v. Virginia* standard as discussed in *White,* we need not decide whether *White* articulated the appropriate standard for federal habeas review of a state tribunal's competency determination. However, we note serious in-

consistency between the *White* decision and case law binding in this circuit. In former Fifth Circuit cases, the federal constitutional issue of competency to stand trial has generally been viewed as a mixed question of law and fact. *Lokos v. Capps,* 625 F.2d 1258, 1267 (5th Cir. 1980); *United States v. Makris,* 535 F.2d 899, 907 (5th Cir.1976). *But see United States v. Gray,* 421 F.2d 316, 317 (5th Cir.1970). Supreme Court precedent also suggests that the issue is a mixed question of law and fact. *See Drope v. Missouri,* 420 U.S. at 175 & n. 10, 95 S.Ct. at 905 & n. 10. *But see Maggio v. Fulford,* 462 U.S. at ——, 103 S.Ct. at 2265–66, 76 L.Ed.2d at 800–02 (four dissenting justices arguing that, contrary to established precedent, the majority had treated competency to stand trial as a purely factual issue).

In reviewing alleged violations of federal constitutional rights that present mixed questions of law and fact, a federal court on a petition for habeas corpus presumes correct any historical factfindings by a state court that determined the issue initially. *Marshall v. Lonberger,* 459 U.S. at 434, 103 S.Ct. at 850, 74 L.Ed.2d at 658 (credibility choices especially eligible for presumption); *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981);

## B. *Framing the Issue*

In examining the competency proceeding in the instant case, we are struck by the virtual absence of conflicting testimony. This is not a case in which the jury heard experts dispute the nature of Strickland's illness or the impact of that illness on his ability to understand the proceedings and communicate with his attorney. The only expert testimony was that Strickland was suffering from a diagnosable mental impairment. Trial Transcript at 305. He suffered from delusional characteristics and had psychotic disorders that made it difficult for him to deal with reality. *Id.* at 187. He was unable, because of his disease, to handle anxiety and synthesize and react normally to events that took place around him. *Id.* at 197. After examining Strickland on the second day of the competency hearing, Dr. Eichler stated that Strickland was "psychotic, delusional, irrational, and unable to distinguish what is happening ... he is in his own little world

and would not know, fully, what is going on around him." *Id.* at 232–33. This description of Strickland's mental state, which was especially probative because of its proximity to the trial, was corroborated by Dr. Westmoreland, a state witness who also examined Strickland during the competency hearing. *See supra* note 12. The expert testimony clearly and unambiguously showed that Strickland was unable to understand the nature of the proceedings against him and participate meaningfully in his defense. *See Bruce v. Estelle*, 536 F.2d at 1063 ("what emerges from this record is a profile of a defendant with a severe psychiatric disorder which most probably caused him to misperceive important elements of the proceedings against him and likely interfered with his ability to relate true facts to his counsel ... the only conclusion we can reach from this record is that Bruce's schizophrenic condition prevented him from effectively consulting

*Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1981) (presumption attaches to "basic, primary or historical: facts 'in the sense of a recital of external events and the credibility of their narrators.'") (quoting *Townsend v. Sain*, 372 U.S. 293 at 309 n. 6, 83 S.Ct. 745 at 755 n. 6, 9 L.Ed.2d 770). *See also* 28 U.S.C. § 2254(d). Purely factual issues, such as whether the defendant suffers from a diagnosable mental impairment, are crucial, sometimes even dispositive, in evaluating the ultimate constitutional question of whether the defendant is able to understand the proceedings and assist his attorney. In the absence of a diagnosable impairment, a defendant's claim of incompetency fails. *See Bolius v. Wainwright*, 597 F.2d 986, 990 (5th Cir.1979); *Bruce v. Estelle (Bruce II)*, 536 F.2d 1051, 1060 (5th Cir.1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). Even if the defendant is found to suffer from a diagnosable mental illness, the issue of competency remains a very fact-sensitive inquiry. *See Drope v. Missouri*, 420 U.S. at 180, 95 S.Ct. at 908 ("[t]he question [of competency] is often a difficult one in which a wide range of manifestations and subtle nuances are implicated"); *United States v. Makris*, 535 F.2d at 904.

In the context of mixed questions of law and fact, unless there is reason to disregard the state court's findings of pure fact and relitigate the factual issues with an evidentiary hearing at the federal level, the federal appellate court must independently apply the legal principles to the facts of the case. *Id. See also Hance v. Zant,*

696 F.2d 940, 946–47 (11th Cir.) (applying rule to numerous "mixed questions"), *cert. denied*, —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); *Gunsby v. Wainwright*, 596 F.2d 654, 655 (5th Cir.1979) (voluntariness of confession), *cert. denied*, 444 U.S. 946, 100 S.Ct. 307, 62 L.Ed.2d 315 (1979); *Mason v. Balcom*, 531 F.2d 717, 722 (5th Cir.1976) (ineffective assistance of counsel).

If called upon to apply this standard in the instant case, the analysis would be further complicated by the absence of express factfindings by the state trier to which we might attach a presumption of correctness. The state proceeding, *see supra* note 2, submitted the "mixed question" of Strickland's competency to a jury, which rendered only a general verdict. In such a case, a federal court can nevertheless adhere to any factfinding implicit in the decision of the state trier. *Townsend v. Sain*, 372 U.S. at 314, 83 S.Ct. at 757. However, if the federal court "cannot ascertain whether the state court found the law or the facts adversely to the petitioner's claim," then a federal evidentiary hearing is required to ascertain the facts. *Id.* at 313–14, 83 S.Ct. at 757–58.

The *Jackson v. Virginia* standard adopted in *White* for federal habeas review of a state competency determination deviates materially from this well-established methodology for reviewing "mixed questions." However, we need not decide the appropriateness of the *White* standard, because on the facts of the instant case, even applying *White*, the jury determination of competency lacks sufficient support.

with his counsel and rationally understanding the proceedings."); *Lokos v. Capps*, 625 F.2d at 1267–69 (expert testimony that petitioner was suffering from paranoid schizophrenia at the time of state conviction, which made him unable to grasp reality, compelled a conclusion of incompetency, even though record contained lay testimony relating to rational behavior).

Most of the historical facts were uncontradicted. Strickland was portrayed as a man with a well-documented history of mental illness, who had received psychiatric evaluation and treatment for the five years preceding his arrest. Witnesses for both Strickland and the state testified that he was capable of rational behavior in non-threatening or routine daily matters, but often evidenced extremely agitated, delusional, and uncontrolled behavior when confronted with emotionally threatening situations. The testimony was also unequivocal that Strickland's mental condition deteriorated throughout his period of confinement and was at a low point when the competency hearing and trial took place.

The testimony was in conflict on only two issues. The first conflict related to Strickland's alleged suicide attempt in the jail on March 10, 1980. Viewing the state's evidence in a favorable light, the jury reasonably could have concluded that Strickland did not take the pills he claimed to have taken.

The more important conflict arose from jailor Ladd's opinion testimony that Strickland was feigning his symptoms. This opinion was contrary to the doctor's very strong and unequivocal testimony on Strickland's diagnosable and consistent mental illness. It also contradicted the doctor's thoroughly studied conclusion that Strickland was not faking. *See supra* note 14.

Thus, our review of Strickland's constitutional claim that he was incompetent to stand involves a single inquiry: viewed in a light most favorable to the state, were these two conflicts in testimony sufficient to allow a reasonable factfinder to disregard the expert testimony that Strickland

was incompetent, and to conclude that the doctors had been fooled?

■ It is well established that a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it. *White v. Estelle*, 669 F.2d at 978; *United States v. Makris*, 535 F.2d at 908. *See also Mims v. United States*, 375 F.2d 135, 143–44 (5th Cir.1967) (sufficiency of evidence on defendant's sanity at time of crime). However, where, as here, the expert testimony so clearly and overwhelmingly points to a conclusion of incompetency, the jury cannot arbitrarily ignore the experts in favor of the observations of laymen. *See Brock v. United States*, 387 F.2d 254, 257 (5th Cir.1967) ("some reason must be objectively present for ignoring expert opinion testimony which is sought to be rebutted only by the observations of laymen"). *See also United States v. Hall*, 583 F.2d 1288, 1294 & n. 10 (5th Cir.1978); *United States v. Makris*, 535 F.2d at 908.

The *Brock* opinion catalogued a number of factors that reasonably could lead a factfinder to disregard expert testimony on the defendant's mental condition. In assessing the factfinder's decision to disregard the experts' opinion, a court on review should consider:

(1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;

(2) possible bias in the experts' appraisal of the defendant's condition;

(3) inconsistencies in the expert's testimony, or material variations between experts; and

(4) the relevance and strength of the contrary lay testimony.

*Brock v. United States*, 387 F.2d at 258 (*quoting Mims v. United States*, 375 F.2d at 143–44). In analyzing these factors, we find insufficient cause for a reasonable jury to disregard the testimony of Strickland's experts.

1. *The accuracy and adequacy of the facts upon which the doctors relied.*

As noted, the doctors relied in part on Strickland's alleged suicide at the jail as a

basis for their conclusion that Strickland was suicidal. The state offered evidence from which a jury could infer that the suicide attempt did not happen as it was described to the doctors.

However, the isolated fact of the suicide attempt was a small portion of the information upon which the doctors relied. They also had examined and tested Strickland extensively and reviewed his past psychological history, which included a number of documented suicide attempts. *See supra* note 9. Furthermore, the doctors' finding that Strickland was suicidal was merely a collateral matter with regard to their more important determination that Strickland was mentally ill and unable to understand the proceedings and participate in his defense. When questioned on rebuttal, the doctors testified that even if the suicide attempt did not take place, in light of the additional overwhelming factual history they examined—which went unchallenged by the state—their opinion was unchanged. Trial transcript at 398–412.

The adequacy of the factual basis for an expert's opinion also might be challenged if the expert relies only on the defendant's subjective description of his symptoms. *See Mims v. United States*, 375 F.2d at 145. The clear danger is that the defendant has a strong interest in portraying his symptoms in a fashion that will support his claim of mental incompetency. *Id. See also United States v. Mota*, 598 F.2d 995, 999 (5th Cir.) (expert testimony disregarded when based on single interview through interpreter, in which doctor was unable to verify truth of defendant's statements to him and unable to conduct psychological tests), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979); *United States v. Makris*, 535 F.2d at 908 (disregarding expert opinion on competency in part because doctors relied only on statements by defendant and they were not aware of defendant's legal problems); *Mims v. United States*, 375 F.2d at 145 (significant in upholding disregard of expert testimony from psychiatrist who relied solely on defendant's statements, was ab-

sence of any history of mental illness). None of the factors noted in these cases is present here. This case presents no valid reason for disregarding the testimony of experts, whose opinion was based on Strickland's documented mental history and objective scores on sophisticated tests, and who were fully aware of the legal consequences of their determination.

Thus, although the state effectively countered one of the relatively minor facts upon which the doctors relied, the doctors' opinions were nevertheless based on overwhelming and accurate additional factors. The single potential inaccuracy in the factual predicate for the doctors' opinion was insufficient ground for a factfinder to disregard the doctors' testimony.

### 2. *Possible Bias*

The second factor works strongly in favor of the doctors' testimony. Both doctors were state employees and one of their important functions as employees was to make expert competency evaluations of state prisoners. *See supra* note 4. The state, which selected the doctors as experts qualified to render an accurate and impartial assessment of Strickland's mental status, did not, and could not, offer any suggestion that the doctors had any interest, beyond their studied professional judgment, in seeing Strickland declared incompetent. *Compare Brock v. United States*, 387 F.2d at 258 (testimony of disinterested government expert not to be disregarded), *with White v. Estelle*, 669 F.2d at 997–98 & n. 8 (noting possible bias in opinion of psychologist, hired by defendant to corroborate findings of other experts).

### 3. *Inconsistency in Expert Opinions, or Conflict Between Experts*

The third factor also does not support the jury's disregard of the expert opinions. The only expert testimony in the case was by the two doctors, who were "so overwhelmed with consistency of his [Strickland's] behavior, his mood, his history, that there was no question" in their minds about their opinions. Trial transcript at

324. *Compare United States v. O'Neal,* 431 F.2d 695 (5th Cir.1970) (where there is conflict in expert testimony, the jury is free to adopt the opinions of some and reject others). Nor was there any inconsistency in the doctors' testimony: both testified repeatedly and without variation that Strickland was mentally ill and totally unable to understand the proceedings and assist in his defense.[17]

### 4. *Comparing the Contrary Lay Testimony*

Finally, lay testimony provided very little impetus for concluding that the doctors were fooled into a misdiagnosis of Strickland's abilities. Jailor Ladd was the only state witness to claim any extended contact with Strickland, and to observe him at times proximate to the competency hearing. Indeed, three of the state's witnesses related only events that took place at the time of the crime,[18] and two others had not seen Strickland in the three months preced-

ing trial—during which time the testimony overwhelmingly showed that Strickland's condition had deteriorated. *See Lokos v. Capps,* 625 F.2d at 1267–68 (to give weight to lay opinion in competency determination, witness should have prolonged and intimate contact with defendant) (*citing United States v. Gray,* 421 F.2d 316, 318 (5th Cir.1970)); *Martin v. Estelle,* 546 F.2d 177 (5th Cir.) (competency is determined at time of trial and relevance of observation testimony determined by proximity to trial), *cert. denied,* 431 U.S. 971, 97 S.Ct. 2935, 53 L.Ed.2d 1069 (1977).[19] Ladd did not offer direct factual testimony on any of the elements of Strickland's competency. Ladd never heard Strickland rationally discuss the upcoming trial and never observed him offering meaningful assistance to counsel. *Compare United States v. Makris,* 535 F.2d at 908–09 (overwhelming evidence by numerous lay witnesses, who had closely interacted with defendant on complex business matters up to and including the trial,

**17.** The Supreme Court of Georgia suggested that Dr. Ermutlu's testimony was inconsistent, quoting a portion of the doctor's testimony to the effect that Strickland was aware of the charge and the consequences and could communicate with his attorney if a relationship was established, and noting later assertedly contradictory testimony that Strickland was incompetent. 247 Ga. 219, 275 S.E.2d at 33. The district court's opinion made similar reference to the asserted inconsistency in Ermutlu's testimony. (Dist.Ct.Op. at 6). However, the record is unmistakable that the quotation from Dr. Ermutlu was in reference to his earlier report, and *not* a description of Strickland's current mental state. *See supra* notes 7–9 and accompanying text. Both doctors repeatedly and resolutely disavowed any inference of competency that might be drawn from the earlier report by explaining that (1) Strickland's condition had deteriorated since that report, and (2) the earlier report was a hypothetical conclusion that was contingent upon Strickland receiving treatment that was not forthcoming. *Id.* The doctors' testimony about Strickland's diagnosis and mental incompetency *at the time of the trial* was absolutely unequivocal. Any inference to the contrary is unsupported by a fair and complete reading of the record.

Nor is there any support whatsoever for the district court's suggestion that the jury might have felt that the doctors' conclusions were based on an erroneous understanding of the legal standard. Record Excerpts at 153. Time

and again, Strickland's counsel queried the doctors on Strickland's competency. The questions and answers consistently stated the proper legal test as the basis for the doctors' conclusion that Strickland was incompetent.

Indeed, both doctors were so resolute in their conviction that Strickland was mentally ill and not competent to stand trial, and stated this opinion so frequently, and so forcefully, that during Strickland's rebuttal case, the court cut off the testimony on the diagnosis and incompetency opinion because it was cumulative. Trial Transcript at 316.

**18.** We note that testimony relating to the circumstances of the crime is generally not relevant on the issue of competency, which focuses on the defendant's mental condition at the time of trial, and can be highly prejudicial. *See Martin v. Estelle,* 546 F.2d 177 (5th Cir.1977) (ordering evidentiary hearing at district court level on competency issue because the state's testimony at competency hearing included repeated and prejudicial references to acts regarding the crime that bore no relation to the competency issue); *Bruce v. Estelle,* 483 F.2d 1031 (5th Cir.1973) (same).

**19.** Dr. Westmoreland examined Strickland during the competency proceeding. *See supra* note 11. His testimony, however, fortifies Strickland's claim and the doctors' opinions, because Westmoreland described only delusional and irrational behavior by Strickland at that time.

was sufficient to rebut contrary opinion by expert, who was uninformed on several material facts). All of the factual occurrences Ladd described—periods when Strickland could behave rationally and other times when Strickland would feel threatened and would howl, laugh, and cry uncontrollably—were fully consistent[20] with Strickland's medical history and the diagnosis of his condition by Drs. Ermutlu, Eichler, and the experts who had treated Strickland since 1975. *See supra* note 12. *Compare United States v. Makris*, 535 F.2d at 908–09 (lay testimony contrary to facts assumed by experts undermines expert opinion).

Ladd, however, disagreed with the state's experts on the conclusions to be drawn from the acts he observed and implied that Strickland was faking. Ladd has no formal psychiatric training (he has a sixth grade education) and, unlike the doctors, did not have the benefit of knowing the overwhelming consistency of Strickland's mental history and scores on a battery of sophisticated tests. On such a shaky and incomplete background, Ladd's testimony, which was factually consistent with the expert opinions, gave little cause for the jury to disregard the testimony of disinterested and qualified experts, who based their unambiguous and uncontradicted opinions on full knowledge of Strickland's background and behavior.

In short, our examination of the factors relevant to disregarding the expert testimony in favor of a contrary conclusion that Strickland was faking, persuades us that the factfinder lacked reasonable cause to do so. Finding that the jury arbitrarily disregarded overwhelming expert testimony that compelled a conclusion of incompetency, we hold that at the time of his trial, Strickland was unable to understand the proceedings against him and assist in his defense.

In holding that the state violated Strickland's right to be competent when tried, we

are further persuaded by distinctions between this case and *White v. Estelle*. In *White*, the court found sufficient support for a jury determination of competency in what the court admitted to be a close question, even under the extremely deferential standard of review the court applied. 669 F.2d at 977. Strickland's evidence at the competency trial was significantly stronger than the evidence in *White* and leads to an opposite conclusion on the sufficiency of the evidence to support the jury's determination.

There was little indication in *White* of any possible history of psychiatric problems which might have fortified the defendant's expert testimony. Cross-examination indicated that the experts' testimony was dependent upon subjective symptoms such as the defendant's descriptions of his hallucinations, and that one of the experts had written his report basically to bolster and corroborate what the other expert had already stated in his report. The cross-examination also revealed inconsistencies in the experts' testimony. The court thus questioned the objectivity of the expert testimony. The state in *White* also convincingly rebutted a material factual premise relied upon by two of the defendant's experts, *i.e.*, whether or not White had suffered from organic brain damage. 669 F.2d at 977–78.

In sharp contrast, there has been no contention here, nor could there be on this record, that the experts relied excessively upon Strickland's subjective descriptions, or that the experts were biased or otherwise lacking in objectivity. Doctors Ermutlu and Eichler were state employees, hired by the state as part of the forensic team whose expressed job description was to provide assistance to the state courts in reaching medical and psychological determinations relevant to criminal trials. The doctors based their opinions upon their numerous examinations, sophisticated psychological tests and an extensive and consist-

---

**20.** Ladd's testimony, that Strickland's irrational behavior was aggravated as the time for "big court" approached is also consistent with the doctors' testimony that stress would aggravate Strickland's condition, and in particular the stress of the trial would do so.

ent history of Strickland's mental illness. The testimony of Doctors Ermutlu and Eichler was remarkably free from inconsistencies, and in fact cannot fairly be described as anything less than unusually overwhelming and certain. There was no indication in *White* that the expert opinions were similarly overwhelming in their certainty. In the instant case, unlike *White*, the state rebutted only a minor factual premise, the significant factual assumptions by the two doctors being uncontroverted. *White* involved disputes of material fact, while the instant case is virtually free of factual conflict.

We are thus convinced that Strickland's proof of incompetency, in particular the authority of his expert testimony, was sufficiently strong to distinguish this case from *White*. The evidence in the instant case—from Strickland's documented history of mental illness, to the acts described by the lay witnesses, to the experts' synthesis of this information into a diagnosis—painted a picture of an extremely disturbed man and demonstrated that he was unable to understand the proceedings and meaningfully participate in his defense.

Our careful review of the record convinces us that there was insufficient evidence to support the jury's competency determination. If the constitutional right to be competent to stand trial cannot be vindicated on the facts of this case, the right is an anemic one indeed. Accordingly, we conclude that the state violated Strickland's right to due process by subjecting him to trial when he was incompetent. We reverse and remand to the district court with instructions to grant Strickland's petition for a writ of habeas corpus.

REVERSED AND REMANDED.