**Robert Lewis WALLACE,
Petitioner-Appellee,
Cross-Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center,
Respondent-Appellant, Cross-Appellee.**

**No. 84–8297.**

United States Court of Appeals,
Eleventh Circuit.

March 13, 1985.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Elyse Aussenberg, Hyatt Legal Svcs., Atlanta, Ga., Risa L. Lieberwitz, N.Y. State School of Industrial & Labor Relations, Ithaca, N.Y., Frank L. Derrickson, Atlanta, Ga., for petitioner-appellee, cross-appellant.

Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

ALBERT J. HENDERSON, Circuit Judge:

Robert Lewis Wallace was convicted in February, 1980, in the Superior Court of Greene County, Georgia, for murder, aggravated assault, motor vehicle theft and driving under the influence of alcohol. He received a sentence of death for the murder and twenty-eight consecutive years for the remaining offenses. After exhausting his state remedies, he filed the present petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia, alleging numerous constitutional errors in his state court proceedings.[1] The district court granted the writ, finding constitutional infirmities in the prosecutor's closing argument but denied it on the remaining grounds. Because we hold that the evidence was insufficient to sustain the finding that Wallace was competent to stand trial, we reverse and remand the judgment of the district court, 581 F.Supp. 1471.

On May 16, 1979, Wallace was taken to the Union Point, Georgia police station on suspicion of driving under the influence of alcohol. While at the station he seized a gun from one of the arresting officers and escaped in a stolen police car, shooting and killing Officer Thomas Rowry and wounding Officer Michael Cook in the process.[2]

---

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. Among these claims were ineffective assistance of counsel, incompetency to stand trial, prejudicial remarks of the state district attorney during closing argument in the penalty phase of the trial and the arbitrary and discriminatory application of the death penalty.

  In view of our conclusion that the evidence was insufficient to support the jury's finding of competency, we do not reach Wallace's other allegations of error and we express no opinion

concerning the correctness of the district court's disposition of the other issues on this appeal. *See Franklin v. Francis,* 720 F.2d 1206, 1208 (11th Cir.1983) (similarly declining to address remaining habeas corpus claims after reversing the denial of the writ on grounds that the trial court's instructions to the jury unconstitutionally shifted the burden of proof), *cert. granted,* — U.S. —, 104 S.Ct. 2677, 81 L.Ed.2d 873 (1984).

2. A more detailed statement of the facts is found in the opinion of the Supreme Court of Georgia

Prior to his trial, Wallace entered a special plea of incompetency to stand trial which was submitted to a jury in accordance with Georgia law.[3] A hearing was held on February 11–12, 1980, at which both Wallace and the state presented evidence. The jury determined that Wallace was competent to stand trial.

■ It is well-established that "the trial and conviction of a person legally incompetent to stand trial violates the due process of law requirements of the Constitution." *Strickland v. Francis*, 738 F.2d 1542, 1543 (11th Cir.1984); *see Drope v. Missouri*, 420 U.S. 162, 171–72, 95 S.Ct. 896, 903–04, 43 L.Ed.2d 103, 112–13 (1975). A criminal defendant may not be subjected to trial if his "mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Id.*, 420 U.S. at 171, 95 S.Ct. at 903, 43 L.Ed.2d at 113; *see also, e.g., Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824, 825 (1960) (per curiam). We begin by analyzing the evidence introduced at the competency

hearing to determine whether it was sufficient to support the jury's finding that Wallace was mentally competent to stand trial.[4]

## I. The Competency Hearing

At the state competency hearing ten witnesses testified for the defense. Wallace's father and sister stated that he used to sniff gasoline regularly as a child and encountered difficulty in communicating with others. Hearing Transcript at 108–09, 120, 126, 130–33. In addition, his father testified that he remained to himself and "got upset" when forced to do things he did not enjoy. Hearing Transcript at 108–09, 119–20, 126, 130–33.

Rev. General Lee Avery, the family minister, observed that Wallace suffered from hallucinations,[5] was a hypochondriac,[6] and could not communicate because of his inability to focus on one topic at a time. He also noted that Wallace would "freeze-up" when the subject of his case arose. From this experience, Rev. Avery concluded that he was incompetent to stand trial. *Id.* at 142–48, 157, 159.

---

on direct appeal. *Wallace v. State*, 248 Ga. 255, 255–57, 282 S.E.2d 325, 328–29 (1981).

3. Under Georgia law
   Whenever a plea is filed that the defendant in a criminal case is mentally incompetent to stand trial, it shall be the duty of the court to cause the issue of the defendant's mental competency to stand trial to be tried first by a special jury.
   O.C.G.A. § 17-7-130(a).

4. Although the district court did not address the sufficiency of the evidence question, our consideration of the issue is nonetheless proper because Wallace raised it in his petition for a writ of habeas corpus. Record at 14–15.

5. Specifically, he stated:
   A. I tried to talk to Robert and on occasion he would sit and stare, looking at the ceiling. Several times he told me that the cameras were watching him, and that bears were in the room with him. . . .
   Hearing Transcript at 142.
   Q. And you mentioned that he told you at one time that T.V. cameras were watching you?
   . . . .
   A. He kept staring around the room as if he was looking for something and as if he was afraid of something and I asked him what it

was that he was looking for and he told me that the T.V. cameras were watching him and I tried to reassure him that there were no T.V. cameras and he said "They are going to get me" and he kept staring around the room. He was very, very uncomfortable and he would not pay attention to what I was saying. He seemed to be looking for something around the room.
   Q. And you also mentioned that he said he saw bears in his cell?
   A. That is correct, and he said he saw six. That there were six bears in the room.
   *Id.* at 145–46.

6. Rev. Avery described Wallace's hypochondria as follows:
   So I talked to him about his spiritual condition and he had very many complaints, physical complaints such as cold spots on his side and the right side of his face was swollen. He complained of veneral disease, he complained of hemorrhoids and I was concerned about his health at that time so I asked him to let me take a visual inspection of some of his complaints that he had and in so doing I was able to see nothing. . . .
   Hearing Transcript at 142.

Four attorneys who had been involved in Wallace's defense also were witnesses at the hearing. John Lee Parrott, appointed to represent Wallace in May, 1979, described him as "unresponsive" and "bizarre." Parrott recalled that his thoughts seemed randomly connected, he tended to ramble and he did not appear to take the criminal charges seriously. Although Parrott noted that he and Wallace made some progress in determining the overall facts of the case and that Wallace gave signs of intelligence at times, he stated that no rapport was ever established between them. He could not keep Wallace "on track" and he was unable to learn many "major salient points." In his opinion, Wallace was not faking. *Id.* at 181–83, 185–87, 191–94.[7] Roy Robinson Kelly, III, another appointed attorney, testified similarly that Wallace was unresponsive, gave vague and erratic answers to questions, and tended to digress with his thoughts. *Id.* at 200–01, 204.

Edward E. Augustine and Katrina Breeding were requested by friends of Wallace's family to represent him in August, 1979.

Augustine confirmed that Wallace was unresponsive, jumped from subject to subject, constantly rambled and focused on unimportant aspects of any ongoing conversation. He also stated that Wallace consistently complained of nonexistent physical ailments and had markedly deteriorated since his incarceration. *Id.* at 210–11, 217, 221, 223–25.[8] Breeding testified that she was never satisfied with her ability to communicate with Wallace, and that he communicated erratically, would digress and often abruptly change topics. She too remembered that he sometimes imagined hearing voices and complained of nonexistent physical problems. In her opinion, Wallace was not disguising his behavior, had deteriorated, and was incompetent to stand trial. *Id.* at 162–64, 167, 170–72, 175–78.[9]

The most relevant testimony came from three psychiatrists, the only medical experts to testify during the competency hearing. Dr. B.N. Hirani evaluated Wallace's mental condition three times since he first saw him on June 25, 1979. As of July 23, 1979, Dr. Hirani diagnosed Wallace as a

7. The following is typical of Parrott's testimony:
   We were asking him questions and he would not give responsive answers to the questions. He would just ramble on and on and there would be no pattern to what he would ramble to. There was no logical system to what he was saying. There was no cohesiveness to it, no coherence to it. He would be talking one second about one aspect of the case and the next second he would volunteer something like he had V.D.
   Hearing Transcript at 183. According to Parrott, there were threats by Wallace to commit suicide.
   [H]e seemed to have no concern whatsoever about the charges that were against him. He didn't seem to take them serious. And then all of a sudden, not showing any kind of transition why he would change, he told us that there was just no choice that he would have to kill himself. And we would say, "Why do you have to kill yourself, you know, give us a reason." And he would say, "There's no choice."
   *Id.* at 185. Parrott stated that various questioning tactics proved ineffective in improving communication with Wallace. *Id.* at 187.

8. Augustine's opinion of Wallace's incompetence was stricken by the trial judge upon objection by the state. Hearing Transcript at 225.
   Like Parrott, Augustine unsuccessfully tried to improve his communication with Wallace by

varying his methods of interrogation. *Id.* at 219–222.

9. The following is representative of Breeding's testimony:
   Q. How would you describe his communication patterns?
   A. They were erratic. For example, I might say, "Robert, let's talk about what happened the night of the alleged incident, or the night of the incident." And sometimes he would look at me and sometimes he would look around the ceiling or make expressions or start talking about something entirely different.... And of all the times I have met with him, I have never been satisfied with our communications.
   Hearing Transcript at 162–63. Breeding also corroborated the accounts of Wallace's hypochondria and hallucinations.
   A. .... And he would keep looking around. And at one time he asked me if I heard the voices. There were no voices.... And he would complain about a lot of physical ailments.... He would talk about cold spots. He would talk about aches. He would tell me to feel parts of his head that were soft. It was obvious that this wasn't the case, he didn't have any soft spots or other ailments.
   *Id.* at 163.

latent-type schizophrenic but concluded he was nonetheless competent to go on trial. After seeing Wallace on an outpatient basis in September, 1979, he reached the same conclusion. Dr. Hirani last saw Wallace on February 6, 1980, less than a week before the competency hearing. He noted deterioration because of the progressive nature of his ailment, and decided at that time that Wallace was incompetent. In Dr. Hirani's view Wallace had the mental capacity to evade a proper competency evaluation, but he thought it was "highly improbable" that Wallace was faking his psychological symptoms. *Id.* at 248, 255–62, 284, 300, 303, 305–06, 311, 318.[10]

Dr. Louis J. Jacobs also examined Wallace on three different occasions. After he first saw Wallace on July 19, 1979, he felt that Wallace was competent to stand trial despite suffering from latent schizophrenia. Dr. Jacobs saw Wallace again as an outpatient in September, 1979, and did not alter his opinion. Like Dr. Hirani, he last examined Wallace on February 6, 1980, and determined that Wallace had deteriorated to the point where he was unable to assist in the trial. Dr. Jacobs suggested that Wallace's incarceration may have contributed to his regression. *Id.* at 322–26, 333–34.[11]

The last witness called by Wallace was Dr. Lloyd T. Baccus. He first interviewed Wallace on August 23, 29 and 30, 1979. In a report dated September 3, 1979, he noted that Wallace displayed symptoms of auditory hallucinations, suffered from paranoid schizophrenia and believed that Wallace was incompetent.[12] Dr. Baccus also saw Wallace briefly the morning he appeared to testify in the competency hearing and observed nothing to warrant a change in his opinion.[13] He stated that Wallace's mental

---

**10.** Dr. Hirani testified that he relied in part on a report by Dr. Lower dated September 6, 1979, in making his evaluation. That report was read into evidence at the competency hearing:

> During the interview, Mr. Wallace displayed blocking and confusion.... Much of his speech was rambling, tangential, and circumstantial, and his associations were definitely loosened. He was evasive and kept focusing attention on his imagined somatic complaints, particularly hemorrhoids.... When previously evaluated at this hospital, Mr. Wallace was given a diagnosis of schizophrenia, latent type ... but was found competent to stand trial and criminally responsible. It was the consensus of the evaluation team that those previous findings should remain undisturbed.... The degree of the success which this team enjoyed in this respect ... suggested that Mr. Wallace may be exaggerating the degree of his mental disorder, although this is by no means a certain conclusion.

Hearing Transcript at 280–81. The symptoms described in the report are substantially similar to those related by all three medical experts.

**11.** Dr. Jacobs described his final examination of Wallace as follows:

> In talking with him before he would—before being the two previous interviews—you would ask him a question and he would start to answer, or would come up with some irrelevant type answer. But, with persistence you could get him back on the subject or on the track. This time his thought process seemed so disorganized that we were not able to get him back on track. Meaning that technically his associations were loose. He couldn't keep his mind on the subject.

Hearing Transcript at 325.

**12.** Dr. Baccus' report, which was read into evidence at the hearing, contained the following illustration of Wallace's mental impairment:

> In response to a question regarding his understanding of the charges against him [Wallace] stated "You're doing this interview hopefully to when you get through then I'll be able to tell you—ask you for some of the same things I want to check out. Like a medical checkup and I have cold spots in the middle of my head for a report from the State Hospital. I don't have bad nerves. I'm waiting for the papers to come back but I don't want to get them involved and I got this thing in my face and my state-appointed lawyer was to take me to the doctor, and I haven't been eating any pork."

Hearing Transcript at 344.

**13.** Dr. Baccus described his twenty-minute interview as follows:

> His speech continued to be illogical when asked to express himself beyond simple yes or no answers or beyond responding to specific direction.... He could, as I indicated, respond to simple questions with simple answers, but as noted before when he was required to think on his own and to conceptualize his own thoughts the loose, disjointed fragmented speech that was noted in the report was currently, and perhaps to some degree more so.

Hearing Transcript at 351.

disease was progressive, and that he did not detect any deception in Wallace's behavior. He suggested that the discrepancy between his September, 1979, conclusion regarding Wallace's competency and the contemporaneous opinions of Dr. Jacobs and Dr. Hirani was based at least in part on the tendency of schizophrenic symptoms to "wax and wane." *Id.* at 342–43, 345–50, 357, 359–60, 365.

Seven witnesses were called by the state. A.C. Gordon, the chief deputy sheriff of Jasper County, testified that he conversed with Wallace each day when Wallace was incarcerated in the Jasper County jail. Gordon stated that Wallace placed and made his own phone calls and read books. Based on these observations, he felt that Wallace was competent. *Id.* at 386–89. Dan Norris, another deputy sheriff of Jasper County, noted that Wallace maintained a neat cell, read, painted, was able to carry on short conversations, and wrote coherent letters. He also concluded that Wallace was competent to stand trial. *Id.* at 391–96.

Clarence Harris, the chief jailer at Baldwin County Jail, had known Wallace since he was transferred to that jail on February 4, 1980, one week before the competency hearing. Harris stated that Wallace maintained good personal hygiene habits, was polite, could carry on short conversations, and could use the telephone. *Id.* at 407–09. Eugene Ellis, the chief deputy sheriff of Baldwin County, testified similarly that Wallace could carry on short conversations and, in his opinion, could effectively assist his attorneys in preparing a defense. *Id.* at 418–19.[14]

In addition to these four officers, the state introduced the testimony of Larry Menasco, Wallace's fellow prisoner at the Baldwin County jail. Menasco testified that Wallace kept a neat cell, could count money, and that he had once seen Wallace make a five minute phone call. *Id.* at 412. E.J. Covington, a Special Agent for the Georgia Bureau of Investigation (GBI), recalled that on May 17, 1979, Wallace had coherently related to him detailed directions on how to locate the stolen vehicle used in the escape from the police station, and a description of certain details of his conduct. *Id.* at 421–23, 427–28, 431–33. Finally, a police officer, Michael Cook, was permitted over objection to relate the events surrounding Wallace's alleged crime. *Id.* at 434–35, 443–46.

---

14. The following is representative of the testimony of Wallace's jailors:

Q. And what does [Wallace] do for recreation?
A. He read a lot. Walked around his cell. He made a phone call most of the time when he asked to.
. . . .
Q. And, have you—you said you had an opportunity to converse with him?
A. I talked to him on several occasion[s] when he complained of being dizzy and weak.
Q. [C]ould he carry on an ordinary conversation [on the telephone]?
A. He did.
Q. Did he place his calls?
A. Right.
Q. Based on your observations and your conversations with him, do you have an opinion as to whether or not he is competent to assist his attorney in the conduct of this trial or not?
A. I would say he is.

Hearing Transcript at 388–89 (testimony of chief deputy sheriff A.C. Gordon).

Q. What would you say about his personal hygiene?
A. ... I don't think he had any personal hygiene problems at all.
. . . .
Q. And in what condition did he maintain his cell?
A. He was very neat.... He did a lot of painting while he was there.... He also read a lot of books ...
Q. Were [his outgoing letters coherent]?
A. Yes.
. . . .
Q. Based on your conversation with him, did you notice him having any trouble with his words or expressing his desires?
A. Robert has a speech impairment. He had trouble with his words at times, but as far as making complete sentences or complete thoughts, I don't think he has a problem.

*Id.* at 391–92, 394–95 (testimony of deputy sheriff Dan Norris). Similarly, chief jailer Clarence Harris testified that the longest conversation he had with Wallace lasted five minutes. *Id.* at 409.

## II. Standard of Review

The appropriate guide for habeas corpus review of the evidence supporting a state jury finding of competency is not entirely clear. Our analysis of the caselaw suggests several possible standards including the deference accorded to state convictions, the presumption of correctness incorporated in 28 U.S.C. § 2254(d), and *de novo* review.[15] We do not, however, attempt to resolve this unsettled question here because there is insufficient evidence to sustain the jury's verdict even under the narrowest criterion. Therefore, to decide this case we apply the standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560, 573 (1979), which requires that the evidence be viewed in the light most favorable to the jury verdict and an inquiry whether any rational trier of fact could conclude that the evidence predominates in favor of the defendant's claim of incompetency. *See generally Strickland*, 738 F.2d at 1550 (similarly reversing state competency finding under *Jackson* standard).

## III. Discussion

There was no dispute among the three experts who examined Wallace that he suffered from schizophrenia, was not feigning his symptoms and was incompetent to stand trial. The opinions of these experts are particularly probative because of their proximity to the time of the competency hearing. *See Strickland*, 738 F.2d at 1554; *Martin v. Estelle*, 546 F.2d 177 (5th Cir.), *cert. denied*, 431 U.S. 971, 97 S.Ct. 2935, 53 L.Ed.2d 1069 (1977).[16] Two of the medical experts, Dr. Hirani and Dr. Jacobs, last examined Wallace less than a week before the hearing. The other expert, Dr. Baccus, although conducting his chief examinations in August, 1979, interviewed Wallace for a short time the morning he appeared as a witness.

The evidence relating to the degenerative nature of Wallace's mental ailment, his deterioration, his hypochondria and his inability to communicate was similarly consistent. Both the state and the defense presented evidence that Wallace was capable of performing many normal routine activities.[17] The facts concerning Wallace's background established without contradiction that he was the product of a broken home, was a loner and consistently had difficulty communicating and maintaining constant trains of thought.

There are four areas of some disagreement. First, there was a split of opinion among the experts whether Wallace was competent to stand trial in September, 1979. Second, the lay witnesses differed in their ultimate conclusions of his competency. Third, it is disputed whether he suffered from auditory hallucinations. Finally, there is arguably a conflict on whether he was distorting his psychological symptoms, despite undisputed expert testimony to the contrary. Under the standard of review employed here, we must consider whether these conflicts in the evidence, viewed in a light most favorable to the state, were sufficient to allow a reasonable factfinder to disregard the unanimous expert testimony that Wallace was incompe-

---

**15.** For a more complete discussion of the various standards of review, see *Strickland*, 738 F.2d at 1550 n. 16.

**16.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

**17.** In this connection, Dr. Jacobs testified:

> Q. And as far as your diagnosis of schizophrenia is concerned, can schizophrenics communicate simple requests, such as allowed to make a telephone call, things like that?
> A. Even in a disorganized state, there would be areas where they could function. For instance, not all will strip their clothes off, not all will smear feces, or get to that level. There are different levels of the disorganization.
> Q. Can schizophrenics function in many normal ways?
> A. Seemingly normal, yes.

Hearing Transcript at 335. Similarly, Dr. Baccus said that Wallace could request normal comforts and handle "those functions not impaired directly by the symptoms [of schizophrenia]." *Id.* at 364–65.

tent to stand trial. *See Strickland,* 738 F.2d at 1552.

It is settled that "a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it." *Strickland,* 738 F.2d at 1552; *see White v. Estelle,* 669 F.2d 973 at 978 (5th Cir.1982). However, when the expert testimony "clearly and overwhelmingly points to a conclusion of incompetency, the jury cannot arbitrarily ignore the experts in favor of the observations of laymen." *Strickland,* 738 F.2d at 1552; *see Brock v. United States,* 387 F.2d 254, 257 (5th Cir. 1967) (requiring objective reason to ignore expert testimony which is rebutted only by lay testimony). In making this judgment, the court should consider

    (1) the correctness or adequacy of the factual assumptions on which the expert opinions are based;

    (2) possible bias in the experts' appraisal of the defendant's condition;

    (3) inconsistencies in the experts' testimony, or material variations between experts; and

    (4) the relevance and strength of the contrary lay testimony.

*Strickland,* 738 F.2d at 1552; *Brock,* 387 F.2d at 258 (quoting *Mims v. United States,* 375 F.2d 135, 143–44 (5th Cir. 1967)).

1. *The correctness and adequacy of the experts' factual assumptions.*

Dr. Baccus relied in part on an investigative report summarizing the testimony of certain of Wallace's friends and family members that Wallace behaved at times in a way suggesting he was having illusions. However, the evidence does not clearly establish that these auditory hallucinations actually took place. Dr. Hirani, for instance, found no evidence of such hallucinations.[18]

Even if we assume that Wallace did not actually suffer from auditory hallucinations the jury still was not justified in disregarding the expert opinions. Both Dr. Hirani and Dr. Jacobs were persuaded that Wallace was incompetent without relying on such evidence. Dr. Hirani felt that it was the disorganization of thought processes, rather than the hallucinations, that formed the "main crux" of his diagnosis.[19] Moreover, although Dr. Baccus acknowledged that his opinion "could" be changed if the witnesses whose interviews comprised the investigative report appeared and recanted their statements, he pointed out unequivocally that he understood that there was no conclusive information concerning whether Wallace in fact suffered from auditory hallucinations.[20] Dr. Baccus considered not just the information in the investigative report but a wide variety of data derived from the records of other examiners as well as his own interviews. Whether Wallace heard phantom sounds is collateral to the crucial determinations that he suffered from a diagnosable mental impairment and was unable to understand and participate in his own defense. *See Strickland,* 738 F.2d at 1553 (suicidal tendencies collateral to incompetency determination).

The next challenge to the opinions of the expert witnesses focuses on whether Wallace was faking his symptoms of mental disease. The Georgia Supreme Court seemed to suggest that the jury could have disregarded the expert opinions for this reason. *See Wallace v. State,* 248 Ga. 255, 258, 282 S.E.2d 325, 330 (1981). This conclusion is apparently predicated on the fact that two of the doctors felt that Wallace was *capable* of fabricating his symptoms. Hearing Transcript, pp. 311, 365. Also, a report upon which Dr. Hirani relied suggested that Wallace might be exaggerating

---

18. Hearing Transcript at 314. Rev. Avery, Katrina Breeding and Dr. Baccus testified to the contrary that Wallace suffered from hallucinations. *Id.* at 143, 145–46, 163, 345–46.

19. Dr. Hirani stated: "I think my findings are generally in agreement with [Dr. Baccus] that

there is a disorganization of thought processes and that is the main crux of the whole thing as I see it." Hearing Transcript at 314.

20. Hearing Transcript at 366–67.

the degree of his mental disorder. *Id.* at 281. There was further testimony that Wallace refused to discuss the facts of his case with the psychiatrists and declined to take certain psychological tests. *Id.* at 299, 301, 331–32.

However, two of the three medical experts testified unequivocally and repeatedly that Wallace was not purposely attempting to deceive those around them. *Id.* at 300, 311, 359, 365.[21] No witness, lay or expert, testified to the contrary. The suggestion in the medical report that Wallace was exaggerating his symptoms was diminished somewhat by the statement that this was "by no means a certain conclusion." *Id.* at 281. It was also rejected by Dr. Hirani. There is no indication in the record that the lack of formal tests or Wallace's refusal to discuss the facts of his case affected any expert's opinion. Indeed, Dr. Hirani stated that Wallace's refusal to talk about his alleged crime was not as important to the evaluation as the manner in which he thought and communicated in response to other questions.[22] Furthermore, the uncontradicted evidence shows that Wallace declined to discuss his case and submit to certain tests on the advice of counsel, *id.* at 301–02, rather than on his own volition. Thus, the expert opinions on Wallace's lack of fabrication could not be disregarded.

Under certain circumstances, the refusal by a criminal defendant to submit to psychological tests may render inadequate the grounds upon which an expert based his opinion independently of any claim of malingering. In *United States v. Mota*, 598 F.2d 995, 999 (5th Cir.), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979), we indicated that the inability of an expert to pursue psychological tests, coupled with the fact that the expert conducted only one interview through an interpreter, and was unable to verify the truth of the defendant's statements to him, was a sufficient reason for the jury to disregard the expert's opinion of the defendant's insanity.

The present case is distinguishable from *Mota*. Here, the doctors did not rely on a single interview, but rather on an extensive series of reports and examinations. The expert in *Mota* admitted that the language barrier impeded his ability to evaluate the defendant's condition and made no effort to verify the information related by the defendant. Here, there were no language impediments and the competency conclusions were based primarily on the ability of Wallace to think and relate rather than on the truthfulness of his statements. For these reasons, *Mota* does not provide a basis upon which the jury could have discounted the expert opinions.[23]

21. Dr. Jacobs was not asked for an opinion on this subject.

22. Dr. Hirani stated in response to a question about Wallace's refusal to talk about the details of his alleged crime:

> My point is that I say it is not the information that he gives us, but the way he thinks and the way he will talk to us about any question. It is not just a matter of the alleged offense. Any other question that does indicate that his thinking was not appropriate or there was some defect in his thinking.

Hearing Transcript at 298.

23. The Supreme Court of Georgia seemed to imply that Wallace's personal neatness was an issue in controversy. *Wallace v. State*, 248 Ga. 255, 258, 282 S.E.2d 325, 329–30 (1981). Dr. Baccus testified that he relied in part on Wallace's deteriorating grooming habits in reaching his conclusion. Hearing Transcript at 345, 370.

The state, however, introduced testimony that Wallace kept a neat cell and maintained good personal hygiene. *E.g., id.* at 391–92, 407–412.

We are not convinced, however, that there was a material conflict in the evidence. Dr. Baccus observed that "[h]is hair wasn't combed, [and] his clothes were a bit rumpled." *Id.* at 370. This description is not necessarily inconsistent with the general observations of his jailers that he was "neat."

Even if there was a conflict in the evidence, it was not sufficient to disregard the expert opinion. There was no indication that Dr. Baccus would have reached a different conclusion had he perceived Wallace to be a neat person, particularly in view of the other information he considered in reaching his decision. Dr. Baccus was aware of the effects of the jail environment on an accused's appearance. *Id.*

This is not a case in which the psychiatrists relied only upon the defendant's subjective description of his symptoms, *see, e.g., Mims,* 375 F.2d at 145; *United States v. Makris,* 535 F.2d 899, 908 (5th Cir.1976), in which the doctors were unaware of the defendant's legal problems, *see, e.g., Mims,* 375 F.2d at 145, or in which there was a lack of any history of mental abnormalities. *Id. See generally Strickland,* 738 F.2d at 1553.

Although the state countered some of the minor grounds upon which the experts relied, their diagnoses were nonetheless based on overwhelming, accurate additional factors. There was insufficient reason, therefore, for the jury to disregard the psychiatrists' testimony.

### 2. *Possible bias*

This factor weighs in favor of the expert medical testimony. Dr. Hirani and Dr. Jacobs are employed by the state at the Central State Hospital and are charged with the duty of making competency evaluations of criminal defendants. Hearing Transcript at 247–48, 320–322. Neither doctor was hired by the defendant; they examined Wallace pursuant to court orders. *Id.* at 248, 322. Although employed by the defense, Dr. Baccus is the Director of Psychiatry and Law at Grady Memorial Hospital in Atlanta and regularly evaluates criminal defendants for various courts. *Id.* at 340–342. The state presented no significant evidence that any of the psychiatrists had any interest in insuring that Wallace be declared incompetent. *See generally Strickland,* 738 F.2d at 1553 (reaching similar conclusion when all psychiatrists employed by the state).

### 3. *Inconsistencies in the experts' testimony*

All three experts testified consistently that Wallace suffered from schizophrenia, was not faking, and was incompetent to stand trial. The expert testimony differed only in two particulars. The first, discussed earlier, concerned Wallace's purported auditory hallucinations. Because this discrepancy is a collateral matter, and did not significantly compromise the adequacy of the experts' factual assumptions, we similarly conclude that it is not a sufficient inconsistency to permit the jury to disregard the expert opinions.

Second, the expert testimony was at variance as to Wallace's competency in September, 1979. Dr. Hirani and Dr. Jacobs expressed a belief that he was competent at that time, whereas Dr. Baccus stated he was incompetent. This inconsistency is irrelevant to Wallace's incompetency to stand trial in February, 1980, upon which there was complete agreement. Dr. Baccus suggested that the inconsistency could be attributed to the tendency of the symptoms of schizophrenia to manifest themselves intermittently. Hearing Transcript at 363.[24] Under these circumstances, the jury was not justified in ignoring the expert opinions. *See generally Strickland,* 738 F.2d at 1553–54 & n. 17 (reaching similar conclusion).

### 4. *The Contrary Lay Testimony*

The strength of the lay testimony as opposed to the experts' opinions was clearly inadequate to permit the jury to disregard the doctors' conclusions. The state called seven witnesses, four of whom were Wallace's jailors and one was a fellow prisoner. These five witnesses could relate only that they observed Wallace performing routine, normal activities such as writing letters, reading books, painting, and making telephone calls, and were successful in carrying on short conversations with him. However, the expert testimony established that the ability to engage in such activity is consistent with schizophrenia. Hearing Transcript at 335, 364–65. Two of the jailors, although expressing opinions

---

**24.** When asked to explain the discrepancy between his finding that Wallace was incompetent in September, 1979, and the contrary conclusions of the other psychiatrists, Dr. Baccus said:

I think, in part, it is a question of when he was seen and how long he was seen by the examiner.... Schizophrenia, like many other mental illnesses, is what we call wax and wane. In other words, the symptoms may be more prominent one day than on another....
Hearing Transcript at 363.

that Wallace was competent to stand trial, admitted that they did not know the legal criteria for determining competency. Chief jailor Clarence Harris and chief deputy sheriff Eugene Ellis, and Larry Menasco, the inmate, did not have extended contact with Wallace since he had arrived at the Baldwin County jail only one week before the competency hearing. *See Strickland,* 738 F.2d at 1554 (to give weight to lay opinion in competency determination witness should have prolonged and intimate contact with the defendant) (citing *Lokos v. Capps,* 625 F.2d 1258, 1267–68 (5th Cir. 1980)).

The testimony of the other two state witnesses was similarly weak. E.J. Covington, a GBI Special Agent, could testify only that Wallace directed him to the location of the escape vehicle and related the details of the alleged crime. His only contact with Wallace, however, was in May, 1979, nine months before the competency hearing and well before the critical expert evaluations. *See Strickland,* 738 F.2d at 1554; *Martin v. Estelle,* 546 F.2d 177 (5th Cir.), *cert. denied,* 431 U.S. 971, 97 S.Ct. 2935, 53 L.Ed.2d 1069 (1977). The only other state witness to testify was Michael Cook, who was allegedly wounded by Wallace during his escape from the police station. Interestingly, Cook was permitted to testify, over defense objections, to his version of the events surrounding the crime. We find nothing in Cook's testimony significantly probative of Wallace's mental state at the time of the trial. We note also that Cook, like Covington, was in contact with Wallace in May, 1979, a time long removed from the relevant period of the hearing. Neither Cook nor Covington had prolonged or intimate contact with Wallace. This evidence is not an adequate basis to disregard the expert testimony.

The evidence in this case is remarkably similar to that in *Strickland,* in which we determined that there was insufficient reason for the jury to disregard the unanimous opinions of psychiatric experts that the defendant was incompetent to stand trial. On the basis of the record before us, we are bound by *Strickland* to reach the

same conclusion. As we stated in *Strickland,* "[i]f the constitutional right to be competent to stand trial cannot be vindicated on the facts of this case, the right is an anemic one indeed." *Strickland,* 738 F.2d at 1556. We conclude that Wallace was denied due process of law when he was tried at a time when he was incompetent to stand trial.

The judgment of the district court is REVERSED and the case REMANDED to the district court with instructions to grant the writ.