PER CURIAM.
The appellant, Harry Clifton Russell, was convicted of murdering Derrick “Shorty” Anderson, see § 13A-6-2, Ala.Code 1975. The circuit court sentenced him to 50 years in prison and directed that he be placed in a long-term mental health treatment program.
The shooting that resulted in Anderson’s death occurred in February 2002. Initially, Russell was found incompetent to assist *781 his attorney in his defense and was committed to Taylor Hardin Secure Medical Facility. After several subsequent evaluations and hearings the circuit court, in November 2007, found that Russell was competent to stand trial. In May 2008, Russell pleaded not guilty by reason of mental disease or defect.
The State’s evidence tended to show the following. On February 16, 2002, police were called to an American Legion Post in Etowah County after Anderson was shot in the parking lot. The shooting was witnessed by Michael McAlpine, an auxiliary member of the American Legion. McAl-pine testified that on the evening of February 16, 2002, he drove into the parking lot of the American Legion and saw Russell, whom he had known for 25 years, and Anderson talking. He said that they talked for several minutes when Russell pulled out a gun, pointed the gun at Anderson’s chest, and pulled the trigger. Russell then walked away, McAlpine said, maybe six steps and returned and fired two more shots at Anderson. Russell then put the gun in his pocket and walked away. McAlpine further testified that Russell was a regular patron at the American Legion, that Russell kept to himself, and that Russell did not socialize with others.
Another member of the American Legion, Harvey Haley, Jr., testified that he was in the building on the evening of the shooting and that he had seen Russell earlier that evening. Haley testified that he saw Anderson and another man order a sandwich and that about 30 minutes later he heard a “pop, pop, pop.” The sound, he said, was coming from the entrance of the American Legion Post, but he could not see because of the way the cars were parked. After the third shot, he said, he saw Russell walking away from the parking lot. Haley testified that Russell never caused problems before, that Russell did not mix well with others, and that Russell was the historian for the American Legion Post.
Mark Harris, a detective with the Gadsden Police Department, testified that he was called to the American Legion Post to investigate the events that occurred on February 16, 2002. Det. Harris testified that after he was informed of the identity of the shooter he went to Russell’s last known address. The house, he said, was in very poor condition; the front door was boarded up, and Russell was entering and exiting the house through one of the windows. Det. Harris and another officer returned to Russell’s residence the next morning and they waited for Russell to exit the house. Russell emerged from the house and started walking. Det. Harris stopped him about one block from his house. A search revealed that Russell was carrying a .38 revolver. Both the State and the defense stipulated that the revolver was the murder weapon.
Det. Harris took Russell into custody and read him his Miranda[1] rights. He testified that Russell was calm and respectful and that he signed a waiver-of-rights form. Russell made the following statement, which was read into evidence by Det. Harris:
“On [February 16] of [2002] I was at [t]he American Legion on Eighth Street when an FBI bulletin came across the TV screen that a guy there was going to kill me. I know the man from seeing him in the Legion the past couple of months, but I do not know his name.
“Shortly after the news bulletin, the man got up and had some food in his hands and pointed his finger at me in a threatening gesture. He then walked *782 outside and I went outside behind him because I was going to go to the movies.
“When I got outside, the man looked at me in a threatening manner and I felt that I had to defend myself, so I pulled my pistol and shot him. The man fell to the ground and I shot him a couple or [sic] more times until I felt that he was no longer a threat.
“I then left and went to the movies and watched ‘Black Hawk Down.’ When the movie was over, I walked around for awhile and then went home.... The next morning, I woke up with the police at my house. I didn’t answer them at the door or when they called for me, but when I thought they left, I unloaded my pistol and left to go to the creek to throw the gun away but was arrested when I got away from my house.”
(R. 223-25.)
Betty Terrell, Russell’s half-sister, testified in his defense. She said that Russell excelled in school and that he joined the United States Army after graduating. While in the Army Russell was a missile repairman and won numerous awards. After leaving the Army he moved in with Terrell’s mother and began working at the Anniston Army Depot. He was fired from the Depot, she said, because of poor hygiene. After leaving the Depot he returned to school to study to become a nurse. He later worked in Guntersville as a nurse, but he did not keep the job for long.
Terrell further testified that after leaving the Army Russell was fidgety, that he often looked over his shoulder, that he talked frequently about the FBI, that he did not associate with people, that he had been under psychiatric care, that his psychiatrist died, and that when his psychiatrist died Russell stopped going to the doctor. She said that at the time of his arrest Russell was living in an abandoned house that had no running water or electricity. The house had belonged to their sister, who had passed away. The sister’s children had had Russell arrested for trespassing.
Russell also presented the testimony of two mental-health experts — Dr. Patricia Pilkinton and Dr. James Hooper. Dr. Pil-kinton, a psychiatrist at Taylor Hardin, testified that she evaluated Russell before trial and that he was her patient from July 2006 to November 2007. Dr. Pilkinton testified that Russell was initially examined by Dr. Denise Perone, a psychiatrist at Taylor Hardin, and found to have a psychosis — he was breaking from reality and seeing and hearing things that were not real. Dr. Perone determined that Russell was paranoid and was having delusions. She said that when Dr. Perone became ill, Russell was treated by Dr. Hooper and was eventually transferred to her care. It was Dr. Pilkinton’s opinion that when Russell shot Anderson he was suffering from a severe mental defect that interfered with his ability to appreciate the nature and character of his actions. Dr. Pilkinton further testified that it was her opinion that Russell had a serious mental illness, that he was schizophrenic, and that he had probably suffered from the illness for some time without being diagnosed or treated. She further testified that schizophrenia is a life-long disorder that manifests itself by antisocial behavior followed by acute symptoms that are characterized by delusions and erratic behavior and/or aggression. Dr. Pilkinton testified that Russell was acutely psychotic and very anxious. She prescribed a different anti-psychotic for Russell, she said, and he began taking care of his personal hygiene. Dr. Pilkinton further testified that if Russell stopped taking his medication his symptoms would reappear.
*783 On cross-examination, Dr. Pilkinton testified that it was possible that some people had lucid intervals even during a period when their mental capacity was declining. She stated that Russell had held a licensed-practical-nurse license until 1997. Dr. Pilkinton further stated that some of Russell’s actions during and immediately after the shooting could be interpreted as goal-directed behavior, a term which she said provides indicia of “logical, thoughtful, forward thinking” or the intention to achieve a desired result. (R. 363.) According to Dr. Pilkinton, Russell felt threatened by the victim, and he knew that if he shot the victim the victim would not be able to injure him. Dr. Pilkinton testified that Russell took specific actions with intended results. She conceded that Russell did not respond to the police when they came to his house and that he removed the bullets from the gun and attempted to dispose of the gun after he thought the police had left. With regard to Russell’s departure from the crime scene, Dr. Pilkinton stated that the manner in which Russell just walked away following the shooting was inconsistent with her diagnosis. Further, Dr. Pilkinton testified that she was not aware of any objective evidence or documented history that Russell suffered any symptoms of mental illness before the offense except for allowing his nursing license to lapse; Dr. Pilkinton conceded that people lose their professional licenses for different reasons and that the changes in Russell’s lifestyle could be described in relation to or attributed to things other than just mental disease.
Dr. Hooper, the director of medical and psychiatric services at Taylor Hardin, testified that Russell was having paranoid delusions while he was treating him and that he had a mental illness for quite some time before the shooting. Dr. Hooper testified that Russell was consistent in his recitation of the details of the shooting and stated that Anderson had threatened him and was going to kill him and that Russell’s actions were consistent with someone with a mental illness and that he believed that Russell was suffering from this mental illness at the time of the shooting.
On cross-examination, Dr. Hooper testified that shooting the victim, walking several feet away, and then walking back to the victim and shooting him two more times while he lay on the ground could be viewed as consistent with Russell’s belief that he was defending himself, but also could be consistent with someone who intends to kill a person and wanted to make certain the person was dead. Dr. Hooper further testified that Russell was capable of forming intent and that he intended to kill the victim:
“[Prosecutor]: And let me ask you this: Was Mr. Russell capable, in your opinion, of forming an intent to kill at that point in time?
“[Dr. Hooper]: I think he was capable of forming an intent, yes, sir.
“[Prosecutor]: So based on his actions, he intended to kill Mr. Anderson?
“[Dr. Hooper]: I think he did intend to kill Mr. Anderson, yes, sir.”
(R. 424.) The following then occurred:
“[Prosecutor]: Okay. Now, you think he understood the concept of self-defense and didn’t believe that he was doing anything wrong?
“[Dr. Hooper]: Yes, sir.
“[Prosecutor]: Well, could you tell me then how hiding the gun would not be an indication of him understanding it was wrong to have shot someone—
“[Dr. Hooper]: Well-—
“[Prosecutor]: — or attempting to hide the gun? I mean, I can understand if you’re acting in self-defense and you believe that and that’s your thought, you *784 know, that the snakes are under the chair and I’m acting in self-defense and I shoot someone, I can understand how I would call the police, how I would get some help, how I would turn in the gun, how the threat’s no longer there, because I haven’t done anything wrong; I have nothing to fear and I certainly don’t have any reason to throw — to hide my gun—
[[Image here]]
“[Prosecutor]: But how is it that that would not be a wrongful act? Or at least an example of objective action so showing that he understood the wrongfulness of what he did?
[[Image here]]
“[Dr. Hooper]: Okay. I think that that goes along with the fact that Mr. Russell, in his mind, was receiving input from the FBI. If he felt like he was being threatened then, I mean, I don’t think that this is a single event where suddenly he gets this message that this guy is going to kill him. Because I think most of us, if we were sitting somewhere and the TV set suddenly said ‘somebody’s going to kill you,’ that we would not just immediately grab a gun and shoot whoever they said; we would wonder what was going on.
“I think that Mr. Russell’s walking away and not responding to the police is all consistent with that. I don’t know whether he was hiding the gun or getting rid of the gun and, I mean, I don’t know that anybody knows that. I can— I don’t see that as an inconsistent act, but it also could be consistent with somebody who was trying to cover up the crime. I mean, you know, I can’t give you a logical answer to that.”
(R. 425-26.) (Emphasis added.) Dr. Hooper further testified that Russell’s act of attempting to discard the gun was not consistent with the theory that Russell believed that his life was still in danger.
“[Dr. Hooper]: Yeah, that isolated event is not as consistent as the rest of it.
“[Prosecutor]: And that’s just like leaving the scene. If you’re not guilty of anything or don’t recognize the wrongfulness of anything, that’s — or running from the — or trying to avoid the police?
“[Dr. Hooper]: Right. I think that those things are all highly consistent. I think that he felt paranoid, was not trustful of other people. He perceived a message that the FBI was going to kill him or that the FBI was telling him that this guy was going to kill him. He shot that guy, then he thought about it and shot him some more to make sure he was dead, then he left went back to his hovel he was living in, he didn’t come out when the police called him and he did apparently get — try to go get rid of the gun. That doesn’t fit into the sto'ry very well. But it—
“[Prosecutor]: That is an objective act that shows or would tend to show, does it not, that he recognized he had done something wrong. Does it not?
“[Dr. Hooper]: It — I don’t see it as such, but I understand that it could be seen as such.
“[Prosecutor]: Right. Well, if a person did understand that they had done something wrong by shooting someone, wouldn’t the logical and correct procedure for them to be — for them to do would be to get rid of the gun? That’s what a logical murderer would do, right?
“[Dr. Hooper]: I guess.
[[Image here]]
“[Dr. Hooper]: I mean, I guess. I mean, I’m not sure what the logic of committing a murder probably is.
“[Prosecutor]: I understand that.
*785 “[Dr. Hooper]: I mean, yeah, getting rid of the weapon is something that lots of people that commit crimes do.
“[Prosecutor]: And that is an indication, is it not, that he understood the wrongfulness of what he’d done?
“[Dr. Hooper]: Well, you’re trying to get me to say that it shows that he knew it was wrong and I’m saying that I’m not really sure what was going on.
“[Prosecutor]: Let me put it this way: Isn’t that just as much an indication that he knew that it was wrong as it is an indication that he was operating under delusion? Couldn’t it go either ivay?
“[Dr. Hooper]: That particular act, yeah, it could go either way.
“[Prosecutor]: Okay. Now, y’all didn’t get to see him to evaluate him — to start observing him until over — well over three years from the time this crime occurred?
“[Dr. Hooper]: Yes.
“[Prosecutor]: And during that period of time, he was incarcerated, as far as you know?
“[Dr. Hooper]: Yes, sir.
“[Prosecutor]: As far as you know, he was receiving no treatment, no medication, no anything like that?
“[Dr. Hooper]: As far as I know, yes, sir.
“[Prosecutor]: Are there not some people in this world who just can’t stand incarceration?
“[Dr. Hooper]: Yes, sir.
“[Prosecutor]: Are there not some people in this world who actually maybe are not mentally incompetent before they go to jail, but when they get to jail they become mentally incompetent because they don’t — they just can’t stand being locked up?
“[Dr. Hooper]: Yes, sir.
“[Prosecutor]: How do you know he’s not one of those people?
“[Dr. Hooper]: I don’t have any hard evidence to say that. I mean, you know, that’s a possibility. Based on thirty years of seeing patients and being at Taylor Hardin for twenty years, I don’t think that’s what’s happened. But I can’t prove it.
“[Prosecutor]: It’s a subjective decision on y’all’s part?
“[Dr. Hooper]: Yes, sir. It is an opinion that all of the psychiatrists share, but yeah.
“[Prosecutor]: And it certainly would have been a whole lot better or you would — let me put it this way: Would you have felt more comfortable with your opinion if you could have seen him, say, a week after it happened?
“[Dr. Hooper]: Oh, yeah, it’s always better to see somebody as soon as possible.”
(R. 430-34.) (Emphasis added.)
The State presented no mental-health expert of its own but relied on the evidence presented by and the cross-examination of the defense’s two experts.
I.
Russell argues on appeal that the circuit court erred in not overturning the jury’s verdict and/or granting his motion for a new trial because, he argues, the verdict was against the great weight of the evidence. Specifically, he argues that the weight of the evidence showed that he had a mental disease or defect that rendered him legally insane at the time of the shooting.
Russell moved for a new trial arguing that the verdict was contrary to law or the weight of the evidence. This issue was preserved for appellate review. See Zum *786 bado v. State, 615 So.2d 1223 (Ala.Crim.App.1993).
In discussing the distinction between the sufficiency of the evidence and the weight of the evidence, this Court in Johnson v. State, 555 So.2d 818 (Ala.Crim.App.1989), stated:
“The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, ‘viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.’ Tibbs v. Florida, 457 U.S. 31, 37, 102 S.Ct. 2211, 2216, 72 L.Ed.2d 652 (1982). Accord, Prantl v. State, 462 So.2d 781, 784 (Ala.Cr.App.1984). The evidence in this case is clearly sufficient to support the convictions. See Donahoo v. State, 505 So.2d 1067, 1070 (Ala.Cr.App.1986); Ward v. State, 484 So.2d 536, 537-38 (Ala.Cr.App.1985).
“In contrast, ‘[t]he “weight of the evidence” refers to “a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.” ’ Tibbs v. Florida, 457 U.S. at 37-38, 102 S.Ct. at 2216 (emphasis added). We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. E.g., Franklin v. State, 405 So.2d 963, 964 (Ala.Cr.App.), cert. denied, 405 So.2d 966 (Ala.1981); Crumpton v. State, 402 So.2d 1081, 1085 (Ala.Cr.App.), cert. denied, 402 So.2d 1088 (Ala.1981); Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). ‘ “[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.” ’ Harris v. State, 513 So.2d 79, 81 (Ala.Cr.App.1987) (quoting Byrd v. State, 24 Ala.App. 451, 136 So. 431 (1931)). In this case, the conflicting evidence offered by the state and by Johnson simply presented a jury question, Gunn v. State, 387 So.2d 280, 282 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980), and the verdicts rendered thereon are conclusive on appeal, Roberson v. State, 162 Ala. 30, 32, 50 So. 345, 346 (1909); Bragg v. State, 518 So.2d 847, 849 (Ala.Cr.App.1987).”
555 So.2d at 819-20.
Section 13A-3-1, Ala.Code 1975, provides:
“(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
“(b) ‘Severe mental disease or defect’ does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
“(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence.”
In Sistrunk v. State, 455 So.2d 287 (Ala.Crim.App.1984), we discussed the burden on a defendant who pleads not guilty by reason of mental disease or defect. We stated:
“Appellant pleaded not guilty by reason of insanity, thereby saddling himself with the heavy burden of proving his insanity by a preponderance of the evidence and to the jury’s reasonable satisfaction. See Herbert v. State, 357 So.2d 683, 688 (Ala.Crim.App.), cert. denied, 357 So.2d 690 (Ala.1978). He sought to prove his lack of criminal responsibility through the testimony of several of his family members as well as expert wit *787 nesses. Appellant now asserts that the verdict must be reversed as against the weight of the evidence.
“The basic principles of law governing the insanity defense are summarized in Herbert, supra. They are:
“ 1. By statute, there is a presumption of sanity extending to all persons over the age of 14.
“ ‘2. The defense of insanity is an affirmative defense. The burden of proving this defense rests upon the defendant and never shifts to the state.
“ ‘3. The burden upon the defendant is to establish the issue of legal insanity by a preponderance of the evidence and to the reasonable satisfaction of the jury.
“ ‘4. The question of insanity at the time of the commission of the crime is a matter to be determined by the jury from a consideration of all the evidence.
“ ‘5. In making its determination, the jury may reject all expert testimony though it is without conflict.
“ ‘6. However, opinion testimony, even of experts must be weighed by the jury and may not be arbitrarily ignored.’
“Herbert is one of only seven cases to date in which an Alabama appellate court has overturned a murder conviction on the ground that the guilty verdict ran against the overwhelming weight of the evidence of insanity. See Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954); Christian v. State, 351 So.2d 623 (Ala.1977); Woods v. State, 364 So.2d 1178 (Ala.Crim.App.), cert. denied, 364 So.2d 1186 (Ala.1978); Sasser v. State, 387 So.2d 237 (Ala.Crim.App.), writ denied, 387 So.2d 244 (Ala.1980); Smith v. State, 411 So.2d 839 (Ala.Crim. App.1982); and Turner v. State, 455 So.2d 910 (Ala.1984). In order for this court to reverse, evidence of insanity must be ‘overwhelming,’ Christian, supra at 625; ‘uncontradicted,’ Herbert, supra, at 689; and ‘clear ... strong and undisputed,’ Boyle v. State, 229 Ala. 212, 222, 154 So. 575, 583 (1934). Furthermore, there may be no facts in evidence which would support a reasonable inference that the defendant was sane. Compare Cunningham v. State, 426 So.2d 484, 491 (Ala.Crim.App.1982), cert. denied, 426 So.2d 484 (Ala.1983), with Alvis v. State, 434 So.2d 859, 864 (Ala.Crim.App.1983). In Cunningham, this court found that ‘[t]he defendant’s conduct and demeanor after the crime provided a reasonable inference of sanity.’ But in Alvis, an assault case, there was nothing in the defendant’s conduct or demeanor to support the inference that his acts ‘were those of a sane man.’ Alvis, id.
“Because of the presumption of sanity, the state is not required to prove that the defendant is sane. See Dancy v. State, 437 So.2d 620, 621 (Ala.Crim.App.1983); Cunningham, supra, at 490. A guilty verdict is not arbitrary if the record reveals any facts from which the jury could have inferred that the defendant was sane at the time of the crime. Cunningham at 489. This is true even though all the expert witnesses testify that the defendant was insane, because of the rule that the jury may reject even uncontradicted expert testimony. Herbert, supra, at 688.
“As we noted in Cunningham, it is a rare case in which the jury’s finding will be disturbed in favor of the appellant’s evidence of insanity. Analysis of these cases requires a careful examination of the record in order to determine what, if any, evidence was available from which *788 the jury could reasonably conclude that the defendant knew what he was doing and/or could have controlled his criminal behavior. Presentation of a mere reasonable doubt of sanity does not authorize an acquittal. Boswell v. State, 63 Ala. 307, 326, 35 Am. Rep. 20 (1880).”
455 So.2d at 288-89.
“ ‘Although “a factfinder need not adhere to an expert opinion on incompetency if there is reason to discount it,” Strickland v. Francis, 738 F.2d 1542, 1552 (11th Cir.1984), “the jury cannot arbitrarily ignore the experts in favor of the observations of laymen,” id., and must have an “objective reason,” to disregard the expert’s opinion which is rebutted only by lay testimony. Wallace v. Kemp, 757 F.2d 1102, 1109 (11th Cir.1985).
“ ‘ “In making this judgment [to disregard the expert’s opinion], the court should consider
“ ‘ “(1) the correctness or adequacy of the factual assumptions on which the expert opinions are based;
“ ‘ “(2) possible bias in the experts’ appraisal of the defendant’s condition;
“1 “(3) inconsistencies in the experts’ testimony, or material variations between experts; and
“ ‘ “(4) the relevance and strength of the contrary lay testimony.
“ ‘ “Strickland, 738 F.2d at 1552; Brock [v. United States,] 387 F.2d [254, 258 (5th Cir.1967) ] (quoting Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967)).”
“ ‘Wallace v. Kemp, 757 F.2d at 1109.’ ”
Dunaway v. State, 746 So.2d 1021, 1033 (Ala.Crim.App.1998), quoting Ellis v. State, 570 So.2d 744, 752-53 (Ala.Crim.App.1990).
In discussing the “objective reasons” that will support disregarding an expert’s opinion, the United States Court of Appeals for the Fifth Circuit has stated:
“It has been recognized that expert opinion evidence may be rebutted by showing the incorrectness or inadequacy of the factual assumptions on which the opinion is based, ‘the reasoning by which he progresses from his material to his conclusion,’ the interest or bias of the expert, inconsistencies or contradictions in his testimony as to material matters, material variations between the experts themselves, and defendant’s lack of cooperation with the expert. Also, in cases involving opinions of medical experts, the probative force of that character of testimony is lessened where it is predicated on subjective symptoms, or where it is based on nawative statements to the expert as to past events not in evidence at the trial. In some cases, the cross examination of the expert may be such as to justify the trier of facts in not being convinced by him. One or more of these factors may, depending on the particular facts of each case, make a jury issue as to the credibility and weight to be given to the expert testimony; and in determining whether such issue is raised, due consideration must be given to the fact that the trier of facts has the opportunity to observe the witness if he testifies in person.”
Mims v. United States, 375 F.2d 135, 143-44 (5th Cir.1967) (footnotes omitted; emphasis added).
Dr. Pilkinton testified on cross-examination that Russell did not come to Taylor Hardin until three years and eight months after the shooting and that it would have been helpful to have evaluated him closer to the time of the shooting. She said that she tried to get outside records to help with their diagnosis but *789 could not obtain any hospital records, any treatment records, or any veteran records related to Russell. Russell had no documented mental illness before the shooting. Dr. Pilkinton further testified that she based her opinion of Russell’s mental condition on information he had supplied to her and observing his conduct. Dr. Pilkin-ton did testify that individuals can lie about their condition, but she believed that Russell was being truthful. Dr. Hooper testified to the following on cross-examination:
“[Prosecutor]: Are there not some people in this world who actually maybe are not mentally incompetent before they go to jail, but when they get to jail they become mentally incompetent because they don’t — they just can’t stand being locked up?
“[Dr. Hooper]: Yes, sir.
“[Prosecutor]: How do you know he’s not one of those people?
“[Dr. Hooper]: I don’t have any hard evidence to say that. I mean, you know, that’s a possibility. Based on thirty years of seeing patients and being at Taylor Hardin for twenty years, I don’t think that’s what’s happened. But I can’t prove it.”
(R. 432-33.)
Although two experts did testify that Russell suffered from a mental disease or defect at the time of the shooting, the jury had “objective reasons” for disregarding them testimony. There was evidence from which the jury could have concluded that Russell appreciated the nature and quality or wrongfulness of his actions. As stated above, witnesses testified concerning Russell’s actions during and after the murder and his attempt to hide the gun he had used to kill Anderson. Here, the question of Russell’s sanity was for the jury to resolve. We will not reweigh the evidence by going behind the jury’s ultimate decision that Russell was not suffering from a mental disease or defect at the time of the shooting. See Sistrunk, supra. The circuit court did not err in declining to overturn the jury’s verdict and denying Russell’s motion for a new trial.
II.
Russell next argues that he was denied the effective assistance of counsel because, he says, his trial counsel failed to make a motion for a directed verdict, failed to object to questioning by the prosecution as irrelevant, prejudicial, and argumentative, and failed to object during sentencing that Russell was incompetent.
However, Russell did not present these claims of ineffective assistance of counsel in his motion for a new trial.
“ ‘ “[A]n ineffective-assistance-of-counsel claim must be presented in a new trial motion filed before the 30-day jurisdictional time limit set by Rule 24.1(b), Ala.R.Crim. P., expires, in order for that claim to be properly preserved for review upon direct appeal.” ’ [Montgomery v. State, 781 So.2d 1007,] at 1010 [ (Ala.Crim.App.2000) ] (quoting Ex parte Ingram, 675 So.2d 863, 865 (Ala.1996)).”
Willingham v. State, 796 So.2d 440, 445 (Ala.Crim.App.2001). These issues were not preserved for appellate review; thus, they are not properly before this Court.
For the foregoing reasons, Russell’s conviction for murder is due to be, and is hereby, affirmed.
AFFIRMED.
WISE, P.J., and WINDOM and MAIN, JJ., concur.
WELCH, J., dissents, with opinion, which KELLUM, J., joins.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).